**CAPITAL CARE CORPORATION,**
**Appellant,**

v.

**John F. HUNT, Appellee.**

Superior Court of Pennsylvania.

Argued Dec. 9, 2003.
Filed March 15, 2004.
Reargument Denied May 14, 2004.

John J. Hare, Arthur W. Lefco, Philadelphia, for appellant.

Michael N. Onufrak, Philadelphia, for appellee.

BEFORE: JOHNSON, LALLY–GREEN and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Capital Care Corporation appeals the entry of judgment *non obstan-*

*te verdicto* (JNOV) on behalf of Appellee John Frazier Hunt. Upon review, we reverse the entry of JNOV and remand for proceedings consistent with this opinion.

¶ 2 This case arises from an action sounding in legal malpractice and breach of fiduciary duty filed by Appellant against Appellee John F. Hunt. Appellant alleged in its complaint that Appellee acted as counsel for both Appellant and a group of British investors with interests adverse to Appellant during a sale of Appellant's assets and that Appellee made false statements prior to the sale that caused Appellant's assets to be sold for an inadequate price. The tortuous factual and procedural history of this case is set forth partially in *Capital Care Corp. v. Lifetime Corp. (Capital Care II)*, 140 EDA 2000, 766 A.2d 883 (Pa.Super. filed 9/15/2000) (unpublished memorandum), as follows:

The events which precipitated this litigation began in 1984. A group of American investors led by Thomas Fleming [ (Fleming) ] were then in control of [Appellant], which owned and controlled a subsidiary corporation, Metropolitan Home Health Services, Inc., which was engaged in the home health care business in the Philadelphia vicinity. A group of British investors, headed by Michael J. Sinclair[, M.D. (Sinclair) ], owned a similar firm, Hospital Capital Corporation, Ltd., which operated in the British Isles, and which had recently acquired an American subsidiary, Residential Health Care, Inc., located in Tennessee. There were discussions between [Fleming] and [Sinclair] concerning their mutual interest in expanding and combining their residential health care operations in [the United States].

As the first step in carrying out their plan, [Appellant] purchased from [Hospital Capital Corporation, Ltd. (Hospital Care), its subsidiary, Residential Health Care, Inc. (Residential Health) ], in exchange for approximately 23% of Appellant's stock. In addition, efforts were thereafter undertaken to increase the capitalization of the enterprise through the issuance of convertible debentures and other means.

[Appellant] did not prosper, although all concerned remained convinced that its future prospects were bright and that the planned expansion should be pursued. [Appellant's] operations from 1984 through 1986 were made possible, in large part, by substantial infusions of cash from the British investors. As their substantial financial stake in the enterprise increased, [Sinclair] and his group were granted greater control of [Appellant], both on [its] Board of Directors and [, as a result of certain voting arrangements associated with financing they had arranged, in voting] control among the shareholders.

It had long been the goal of both groups to attempt to acquire [, Superior Care, Inc. (Superior Care) ] a large firm engaged in the residential homecare business in the New York [area. The principal of that firm, a gentleman named Rubin,] had initially broached the subject of a possible acquisition with [Sinclair] in 1983. With the consent of all concerned, negotiations were resumed in earnest in 1985. It soon developed, however, that [Rubin] was not interested in any transaction which would involve [Fleming or Appellant]. He was, however, very much interested in pursuing the possible acquisition of Superior Care by [Sinclair's] British firm, [Hospital Care Corporation, Ltd.]. All concerned [with acquiring Appellant], *i.e.*, the Sinclair group and the Flem-

ing group, agreed that the proposed transaction should be carried out in two steps: first, acquisition of [Superior Care by Hospital Care] (more specifically, a new corporation to be formed for the purpose of [acquiring Superior Care] ), to be followed by a merger between [Appellant] and the acquiring firm.

The acquisition of Superior Care by [Hospital Care] (renamed as Lifetime Corporation) was completed in early 1986, pursuant to a final agreement executed in November 1985.

[On October 23, 1986, Appellant's directors] signed an agreement to sell all of the then-remaining assets of [Appellant (including two health-care subsidiaries and a separate equipment subsidiary, which equipment subsidiary was sold to a third-party not involved in this litigation) ], in exchange for approximately 359,000 shares of [Appellant's] stock, which [stock] was valued at $2.50 per share. Shareholder ratification of this transaction was [obtained] at a special meeting held on [June 19, 1987].

The record does not fully detail the shifts in management and control of [Appellant] which [occurred] since June 1987. Apparently, although [Appellant was not] in bankruptcy, representatives of [a creditor committee controlled Appellant's affairs during the pendency of this litigation].

[Appellant commenced this litigation *via* complaint in the United States District Court for the Eastern District of Pennsylvania] on March 30, 1988. Named as defendants were [Sinclair, Appellee, who served as general counsel of Appellant, and Hazel Garner, an associate in Appellee's office who assisted in negotiations and document-drafting for the purchase.

Appellant asserted] a wide variety of claims under the federal securities laws, various RICO violations, and a host of state-law claims sounding both in contract and tort.

[The bases of Appellant's state-law tort allegations were] charges of conversion, fraud, interference with prospective commercial advantage [and, as to Appellee and Garner, legal malpractice].

*Capital Care Corporation v. Lifetime Corporation [ (Capital Care I) ]*, No. 930 Philadelphia 1994, unpublished memorandum at 1–3, 445 Pa.Super. 644, 665 A.2d 1297 (Pa.Super. filed [6/16/95] ) (*citing* U.S. District Court [Memorandum] filed 10/16/90, at 1–6).

The U.S. District Court [dismissed initially] "some federal securities law claims and one of the pendent state law claims" on motions to dismiss, and then disposed of the balance of the case by entering summary judgment in favor of all [ . . . ] defendants and dismissing [Appellant's] federal claims and all pre-[October 23, 1986] state law claims. [*Capital Care I*, 930 Philadelphia 1994, at 4]. The District Count [explained specifically] that its "determination that the [October 23, 1986 release (the release) ] is valid and binding upon [Appellant] also disposes of all pre-[October 23, 1986] claims arising under state law." U.S. District Court [Memorandum], filed 10/16/90, at 21. The District Court also noted that it "expressed no view as to whether [Appellant had] any claims under state law which survive[d] the foregoing rulings." *Id.*

[Appellant] appealed the District Court's grant of summary judgment which was subsequently affirmed by the Third Circuit Court of Appeals. During the pendency of the appeal, however, [Appellant] also filed an identical com-

plaint with the Court of Common Pleas of Philadelphia County. [Appellee] then moved for summary judgment before the Court of Common Pleas, and summary judgment was granted on February 1, 1994, "with respect to all claims arising prior to [October 23, 1986]." Trial Court order, filed 2/1/94.

[Appellant] appealed the grant of summary judgment in [Appellee's] favor to [this Court], and [he] raise[d] the following arguments:

1. Whether the trial court properly granted summary judgment in [Appellee's] favor as to [Appellant's] pre-[October 23, 1986] state-law claims based solely upon the collateral estoppel effect of [U.S. District Court] Judge Fullam's memorandum and order of October 16, 1990.

2. Whether the release contained in the [October 23, 1986] stock purchase agreement waived [Appellee's] liability to [Appellant] for malpractice and breach of fiduciary duties as to pre-[October 23, 1986 state-law] claims in connection with [Appellee's] actions as [Appellant's] lawyer.

*[Capital Care I],* [930 Philadelphia 1994,] at 1–3 (Pa.Super. filed [6/16/95]). In affirming the trial court, [this Court] found that the trial court "properly concluded that collateral estoppel precluded [Appellant] from raising issues previously adjudicated in the federal court action," and that the [release] was binding upon [Appellant] with regard to pre-[October 23, 1986 state-law] claims. *Id.,* [930 Philadelphia 1994], at 11, 13–14.

After [this Court] affirmed the grant of summary judgment in [Appellee's] favor, [Appellant's] case proceeded against the defendants for any remaining post-[October 23, 1986 state-law] claims.

[Appellant] specifically alleged that three claims remained against [Appellee]: breach of fiduciary duty, legal malpractice, and fraud.

In April 1999, [Appellee] filed motions *in limine* requesting the [trial] court to bar the introduction of expert testimony [regarding Appellee's behavior before and after October 23, 1986,] by [Appellant] and to adopt the finding that the October [23, 1986] stock purchase agreement [was] binding on [Appellant]. On April 14, 1999, the trial court granted the motions *in limine* in favor of [Appellee], citing the law of the case doctrine. Once the motions *in limine* were granted, the trial court found that no claims remained against [Appellee], and, on May 4, 1999, it granted a directed verdict in [Appellee's] favor. [Appellant] responded by filing a motion for post-trial relief on May 24, 1999. The trial court heard oral argument on September 14, 1999, after which the trial court [denied the motion and entered judgment in favor of Appellee].

*Capital Care II,* 140 EDA 2000, at 1–6 (footnotes omitted).

¶ 3 After judgment was entered in Appellee's favor, Appellant appealed to this Court. Appellant contended that its post-October 23, 1986 claims against Appellee were preserved from dismissal by the U.S. District Court and, therefore, were precluded from summary judgment by the trial court and this Court. On review, we agreed with Appellant and reversed the trial court's entry of judgment in Appellee's favor. *Capital Care II,* 140 EDA 2000, at 7–9. We then remanded the case to the trial court for consideration of Appellant's post-October 23, 1986, claims. *Id.,* 140 EDA 2000, at 9.

¶ 4 Following remand, the case proceeded through pre-trial pleadings to trial. Trial commenced on January 28, 2002, and

concluded on February 4, 2002. At the conclusion of trial, the jury found in favor of Appellant and awarded $2.5 million in damages for Appellant's legal malpractice claim. The jury found Appellee liable for breach of fiduciary duty but returned a "zero damage award" with respect to that claim. Thereafter, both parties filed timely motions for post-trial relief. Appellee's post-trial motions requested relief in the form of JNOV or a new trial, as well as a motion for *remittur*, and Appellant's post-trial motions requested a molding of the damage award and included a motion for *additur*. On May 21, 2002, the trial court granted Appellee's motion for JNOV and entered judgment in his favor. The trial court denied as moot Appellee's motion for a new trial and motion for *remittur*. On the same day, the trial court denied Appellant's post-trial motions.

¶ 5 On June 19, 2002, Appellant filed a timely notice of appeal to this Court. The trial court ordered Appellant to file a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b), and Appellant complied. Thereafter, the trial court authored an opinion pursuant to Pa. R.A.P. 1925(a) that addressed Appellant's matters.

¶ 6 On appeal, Appellant asks this Court to analyze the following questions:

I. Whether the trial court erred in finding that [Appellee] was not providing legal services during the shareholders' meeting of June 19, 1987?

II. Whether the trial court's entry of [JNOV] was improper because [Appellant] presented ample evidence to support the jury's award of damages?

III. Whether [the Superior Court] should mold the verdict to enter

judgment on [Appellant's] breach of fiduciary duty claim in the amount of $2.5 million if [this Court] overturns the entry of JNOV [in favor of Appellee]?

IV. Whether the trial court erred [when it questioned the jury regarding its] rationale [for its damage award] after its verdict was rendered and the jurors were polled?

Appellant's brief, at 5.[1]

■ ¶ 7 Appellant's first three issues challenge the trial court's entry of JNOV on behalf of Appellee. Our standard of review for an attack upon a trial court's grant of JNOV is as follows:

> In reviewing a trial court's decision whether or not to grant judgment in favor of one of the parties, we must consider the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner. Our standard of review when considering motions for a directed verdict and judgment notwithstanding the verdict are identical. We will reverse a trial court's grant or denial of a judgment notwithstanding the verdict only when we find an abuse of discretion or an error of law that controlled the outcome of the case. Further, the standard of review for an appellate court is the same as that for a trial court.
>
> There are two bases upon which a judgment N.O.V. can be entered: one, the movant is entitled to judgment as a matter of law and/or two, the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant. With the first, the court reviews the record and concludes that[,] even with all factual inferences

---

1. We have renumbered Appellant's issues.

decided adverse to the movant[,] the law nonetheless requires a verdict in his favor[. W]hereas with the second[,] the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

*See Goldberg v. Isdaner*, 780 A.2d 654, 659–60 (Pa.Super.2001).

¶ 8 Appellant contends first that the trial court's grant of JNOV in favor of Appellee was improper because it established evidence sufficient to prove that Appellee provided legal services to Appellant during the shareholders' meeting held on June 19, 1987. The trial court concluded in its opinion that Appellee was not representing Appellant at the time of the June 19, 1987 meeting and, thus, no cause of action for legal malpractice existed.[2] Of course, to prevail in a legal malpractice action, a plaintiff-client must demonstrate the following: (1) employment of the defendant-attorney or other basis of duty owed to the plaintiff-client by the defendant-attorney; (2) the failure of the defendant-attorney to exercise ordinary skill and knowledge in the exercise of that duty; (3) such failure was the proximate cause of actual damages to the plaintiff-client. *See Curran v. Stradley, Ronon, Stevens and Young*, 361 Pa.Super. 17, 521 A.2d 451, 457 (1987).

¶ 9 The basis of Appellant's malpractice claim against Appellee was that at the June 19, 1987 shareholders' meeting, Appellee misrepresented to Appellant's agents and shareholders that an expired voting proxy of Appellant's shares owned by Butler A. Fleming (the Butler proxy) held by Rida Khalifa, a British director of Appellant, was extended. Appellant alleged that the effect of this misrepresentation led its shareholders to believe that the required 50% quorum of voting shares was present at the meeting, and, therefore, the shareholders approved improperly a grossly-undervalued sale of Appellant's assets. *See* Appellant's complaint, 3/30/1988, at ¶ # 38–39. Thus, the crucial point of our inquiry becomes whether Appellee represented Appellant at the June 19, 1987 shareholders' meeting.

¶ 10 Viewing the facts in a light most favorable to Appellant as the verdict winner, the record reveals the following: Appellant and the principals of Lifetime Corporation had an understanding that the value of Appellant's assets were one million shares of Lifetime Corporation stock and a $4 million dollar zero-coupon bond, and Lifetime Corporation would acquire Appellant's assets for that price. Despite being a member of the board of Lifetime Corporation and their general counsel, Appellee and his firm still represented Appellant. Acting in his role as Appellant's counsel, Appellee met with Appellant's three remaining directors on September 23, 1986. The meeting was called to discuss the impending sale of Appellant's assets to Lifetime Corporation. At the meeting, Appellee and his associate, Garner, proposed that Appellant accept 359,000 shares of Lifetime Corporation stock in exchange for all of the stock of Appel-

---

2. Appellant asserts that the trial court reached this conclusion improperly, as Appellee raised this issue in his post-trial motions but did not brief the issue in its post-trial brief. Accordingly, Appellant contends the issue was waived and precluded from the trial court's consideration when it decided Appellee's post-trial motions. *See, e.g., Bell v. City of Philadelphia*, 341 Pa.Super. 534, 491 A.2d 1386 (1985). Appellant's contention is incorrect; Appellee preserved this issue in his post-trial motions, and the corresponding legal argument, albeit brief, appears on page 14–15 of Appellee's post-trial brief. *See* Appellee's brief in support of post-trial relief, 4/23/2002, at 14–15. Accordingly, the issue was not waived during adjudication of Appellee's post-trial motions.

lant's principal subsidiaries, Metropolitan and Residential. At the conclusion of the meeting, Appellee stated that his law firm intended to withdraw as counsel for Appellant. Thereafter, on October 22, 1986, Appellant's three directors met and authorized, subject to shareholder approval, a sale of Appellant's assets to Lifetime Corporation for 359,000 shares of Lifetime Corporation stock.

¶ 11 After Appellee "withdrew" from Appellant's representation, David Fishbone, Esq. (Fishbone)[3] undertook representation of Appellant at Appellee's request for the purpose of "get[ting] the [sale of Appellant's assets] accomplished and to take whatever funds would be realized from the sale and use it to wind up [Appellant's business] and distribute [funds] to creditors." *See* N.T. Trial, 1/29/2002, at 144. Despite withdrawing "formally" from representing Appellant, Appellee and his firm continued to assist Fishbone in handling Appellant's legal affairs. At trial, Fishbone testified that Appellee continued to provide legal services to Appellant with regard to matters of corporate governance; Appellee and his firm aided Fishbone by helping him to organize the June 19, 1987 shareholders' meeting, and Appellee appeared before the United States Securities and Exchange Commission in hearings regarding complaints made by shareholders with respect to the sales of Appellant's securities. *Id.* at 155–61.

¶ 12 The law which governs the practice of law in this Commonwealth does not require a traditional fee-for-service contract to be executed between an attorney and a prospective client to create an attorney-client relationship. *See, e.g., Minnich v. Yost*, 817 A.2d 538, 542 (Pa.Super.2003). Absent an express contract, an implied attorney-client relationship will be found if the following are shown: (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to render such assistance; and (4) it was reasonable for the putative client to believe the attorney was representing him. *Id.,* 817 A.2d at 542 (citation omitted). Accordingly, although Appellee withdrew "formally" from Appellant's representation on September 23, 1986, the testimony presented at trial was sufficient to demonstrate that, at the request of Fishbone, Appellant's agent, Appellee continued to advise and assist Appellant regarding matters of corporate law and securities transactions, Appellee's professed areas of expertise. N.T. Trial, 1/29/2002, at 156. Part of the advice given by Appellee and his firm to Appellant consisted of aiding Fishbone in the organization and execution of the June 19, 1987 shareholders' meeting and advising Appellant's shareholders at the meeting regarding the Butler proxy. Therefore, despite Appellee's "withdrawal" from Appellant's representation and dual representation of Appellant and Lifetime Corporation, it was reasonable for Appellant's agents to believe that Appellee was still representing Appellant at the time of the shareholder's meeting. *Id.,* 817 A.2d at 542. This conclusion is buttressed by the testimony of Jack Fisher, Appellant's president at the time of the shareholders' meeting. Mr. Fisher testified that he understood Appellee to represent Appellant at that time. *See also* N.T. Trial, 1/30/2002, at 51. Accordingly, we are constrained to find that the trial court erred when it concluded that Appellee did not provide legal services to Appellant at the time of the June 19,

---

**3.** Fishbone resigned from the Bar of this Commonwealth in 1993 and was thereafter disbarred by consent for matters unrelated to this case.

1987 shareholders' meeting. As such, the trial erred when it granted JNOV based on its conclusion that an attorney-client relationship did not exist between Appellee and Appellant at the time of the June 19, 1987 shareholders' meeting.

¶ 13 The trial court, in its Pa.R.A.P. 1925(a) opinion, did not consider the question of whether Appellee breached his duty of care by misrepresenting to Appellant's agents and shareholders at the shareholders' meeting that the Butler Proxy had been extended, as it concluded that no attorney-client relationship existed between Appellee and Appellant at the time of the meeting. Because we are led to the opposite conclusion, it is necessary to consider whether Appellee's statements at the June 19, 1987 shareholders' meeting constituted a breach of his duty as an attorney to Appellant.

■ ¶ 14 It is axiomatic that an attorney who undertakes representation of a client owes that client both a duty of competent representation and the highest duty of honesty, fidelity, and confidentiality. *See, e.g., Office of Disciplinary Counsel v. Holston,* 533 Pa. 78, 619 A.2d 1054 (1993). An *intentional* misrepresentation to a client during any transaction where an attorney represents that client is clearly a violation of that attorney's duty of honesty. In the present case, the jury found specifically that Appellee made a false statement intentionally to Appellant's agents and shareholders regarding the existence of the Butler Proxy. *See* Special interrogatories to jury, at 1 (unnumbered). Upon review, we are satisfied that the jury's finding is supported by the record, and,

therefore, we will not disturb those findings on appeal. *See Peterson v. Shreiner,* 822 A.2d 833, 839 (Pa.Super.2003) (citation omitted).

■ ¶ 15 Next, we consider whether the trial court erred in its conclusion that Appellee was entitled to JNOV because Appellant failed to prove actual damages resulting from Appellee's conduct. In his post-trial motions, Appellee alleged that Appellant failed to prove actual damages on its legal malpractice claim.[4] The trial court agreed with Appellee and entered JNOV on Appellee's behalf.

■ ¶ 16 In a legal malpractice action, it is not sufficient for a plaintiff to prove *future* or *speculative* damages. *Pashak v. Barish,* 303 Pa.Super. 559, 450 A.2d 67 (1982). Rather, a plaintiff must prove *actual* damages arising from an attorney's breach of duty. *See Curran,* 521 A.2d at 457. In *Pashak v. Barish,* 450 A.2d at 69, we explained:

> The test of whether damages [in a legal malpractice action] are remote or speculative has nothing to do with the difficulty in calculating the amount, but deals with the more basic question of whether there are identifiable damages. *The mere possibility or even probability that the plaintiff will sustain an injury at some future time does not alter the speculative nature of the damage claim or support a cause of action for legal malpractice.*
>
> * * *
>
> Thus, damages are speculative only if the uncertainty concerns the *fact* of damages rather than the *amount.*

4. Appellant asserts that this claim was waived as a result of Appellee's failure to move for a directed verdict on the basis that Appellant failed to prove damages. We disagree. This claim was presented to the trial court in Appellant's post-trial motions, and the trial court chose to address it. Therefore, we decline to find this claim waived. *See Soderberg v. Weisel,* 455 Pa.Super. 158, 687 A.2d 839, 845 (1997) (holding not waived claim first raised in post-trial motion and addressed by trial court).

*Pashak,* 450 A.2d at 69 (citations omitted) (emphasis in original).

██ ¶ 17 In its Pa.R.A.P. 1925(a) opinion, the trial court concluded that the jury's verdict was speculative and stated that "the jury's only means of measuring damages was speculative as to the value of [Appellant] as well as whether the British [,*i.e.,* Lifetime Corporation,] or any other person or entity would have purchased additional stock but for the acts and/or omissions of [Appellee]." Trial court opinion, 5/2/2003, at 5. We disagree.

¶ 18 We begin with a discussion of the value of Appellant's assets. The testimony presented by Appellant at trial indicated that the fair value of Appellant's assets several months prior to the shareholders' meeting was approximately one million shares of Lifetime Corporation stock plus a $4 million dollar zero-coupon bond, *i.e.,* the valuation arrived at by Appellant and Lifetime Corporation in their negotiations. *See* N.T. Trial, 1/28/2002, at 98–99 (testimony of Thomas Fleming); *see also id.,* 1/29/2002, at 52 (testimony of Henry Siedzikowski, Esq.). The jury accepted this testimony, and we will not now overturn its determination of the facts. *Peterson,* 822 A.2d at 839. Therefore, we conclude that Appellant's value was approximately one million shares of Lifetime Corporation stock plus a $4 million dollar zero-coupon bond.

██ ¶ 19 Accordingly, the crucial question for our damage analysis is whether Appellee's conduct prevented Appellant from realizing the above fair value for its assets. We conclude that Appellee's conduct did, in fact, prevent Appellant from realizing a fair value for its assets. We analogize the present case to one in which a plaintiff has been fraudulently induced into settling an action by their attorney. *See, e.g., Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick,*

526 Pa. 541, 587 A.2d 1346 (1991). In such a case, an action for legal malpractice lies against the defrauding attorney where it can be shown that the attorney's conduct prevented a plaintiff from exploring, before settlement, whether the terms of the proffered settlement were or were not advantageous to the plaintiff. *See White v. Kreithen,* 435 Pa.Super. 115, 644 A.2d 1262, 1265 (1994). Herein, Appellant notified the shareholders fraudulently that the Butler proxy had been extended. This misrepresentation fostered a belief among Appellant's shareholders that a quorum existed for the June 19, 1987 shareholders' meeting, and, therefore, Appellant's assets were sold for a far lower amount than could have been realized at a future sale, *see* N.T. Trial, 1/28/2002, at 98–99, or *via* a "liquidating" Chapter 11 bankruptcy, *see* N.T. Trial, 1/29/2002, at 148–151 (testimony of David Fishbone).

¶ 20 As in the "settlement malpractice" cases, Appellee's misrepresentation prevented the shareholders from exploring, before the shareholders' meeting and resulting sale of Appellant's assets, other options that would have garnered a fairer sale of Appellant's assets. As its damage evidence, Appellant presented the value of the $4 million dollar zero-coupon bond plus the cash value of 641,000 shares of Lifetime Corporation stock (the portion of Appellant's proven value not realized in the sale as a result of Appellee's misrepresentation, *i.e.,* one million shares of Lifetime stock minus 359,000 shares actually sold) according to the terms of the sale that took place following the shareholders' meeting. Therefore, we are satisfied that Appellant has proven *the fact* of actual damages with sufficient evidence. *Pashak,* 450 A.2d at 69. Consequently, we are constrained to conclude that the trial court's entry of JNOV on behalf of Appellee was erroneous. Accordingly, we must

reverse the entry of JNOV on Appellee's behalf.

¶ 21 Although we conclude that we must reverse the entry of JNOV on Appellee's behalf, we are unable to address the remainder of Appellant's arguments regarding the propriety of the amount of the damage award due to a procedural irregularity within the record.[5] Pennsylvania Rule of Civil Procedure 227.1(e) requires:

> [I]f a new trial and the entry of judgment are sought in the alternative, the court shall dispose of both requests. If the court directs the entry of judgment, it shall also rule on the request for a new trial by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the request for a new trial.

¶ 22 In its disposition of Appellee's post-trial motions, the trial court granted Appellee's motion for JNOV and "denied as moot" Appellee's motion for a new trial and *remittur*. However, inasmuch as we have determined that JNOV should not have been granted by the trial court, these issues are not moot. Thus, to prevent the current circumstance from occurring, Rule 227.1(e) requires a motion for a new trial to be addressed with specificity regardless of whether judgment was entered for the moving party. *See* Pa.R.Civ.P. 227.1(e). In an attempt to rectify this error, the trial court presented an analysis of Appellee's motion for a new trial in its Pa.R.A.P. 1925(a) opinion and concluded that Appellee's motion for a new trial was without merit. *See* Trial court opinion, 5/3/2002, at 9. The trial court provided no analysis

with respect to Appellee's motion for *remittur* in its opinion.

¶ 23 Appellee argues that this Court should, in the interest of judicial economy, review the trial court's "denial" of his motion for a new trial because we have the benefit of the trial court's reasoning in its 1925(a) opinion. However, as we have determined that we must reverse the trial court's entry of JNOV, it follows that *Appellant* is also entitled to a ruling on its post-trial motions to mold the verdict, which the trial court denied due to its grant of JNOV in Appellee's favor, and Appellant now raises on appeal. We conclude that the trial court is in the best position to review those claims, as well as Appellee's motion for a new trial and *remittur*. *See, e.g., Armbruster v. Horowitz,* 572 Pa. 1, 8, 813 A.2d 698, 702 (2002) (weight of the evidence claims are addressed primarily to discretion of the trial court). Thus, judicial economy would be best served by reversing the entry of JNOV on Appellee's behalf, vacating the orders denying Appellant's post-trial motions and Appellee's post-trial motion for a new trial and motion for *remittur*, and remanding the case to the trial court for a disposition limited to those claims.

¶ 24 In sum, we reverse the entry of JNOV on Appellee's behalf, vacate the trial court's denial of Appellee's post-trial motion for a new trial and *remittur*, vacate the denial of Appellant's post-trial motions, and remand the case to the trial court for the sole purpose of adjudicating Appellant's post-trial motions and Appellee's motion for a new trial and motion for *remittur*.

---

**5.** Appellant also raises an argument that the trial court questioned the jury improperly regarding its damage award after the verdict had been entered. A review of the record indicates that Appellant failed to argue this issue in its brief in support of its post-trial motions. Accordingly, the argument is waived. *See Jackson v. Kassab,* 812 A.2d 1233, 1236 (Pa.Super.2002).

¶ 25 Judgment reversed. Orders vacated. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.