**Mark KIRSCHNER, in his capacity as the Liquidation Trustee of the Le–Nature's Liquidation Trust, Appellant**

v.

**K & L GATES LLP, Sanford Ferguson, Pascarella & Wiker, LLP, and Carl A. Wiker.**

Superior Court of Pennsylvania.

Argued Oct. 25, 2011.

Filed May 14, 2012.

Reargument Denied July 19, 2012.

Roy E. Leonard, Pittsburgh, Hector Torres, New York, New York and Cara M. Ciuffani, New York, New York, for appellant.

Craig D. Singer, Washington, D.C., for Ferguson and K & L Gates, appellees.

Patricia L. Dodge, Pittsburgh, for Pascarella & Wiker and Wiker, appellees.

BEFORE: MUSMANNO, ALLEN and MUNDY, JJ.

OPINION BY MUSMANNO, J.:

Mark Kirschner ("Trustee"), in his capacity as the Liquidation Trustee of the Le–Nature's Liquidation Trust,[1] appeals from the Order sustaining the Preliminary Objections to the Amended Complaint filed on behalf of K & L Gates LLP and Sanford Ferguson ("Ferguson") (collectively, "K & L Gates"), and Pascarella & Wiker, LLP ("P & W"), and Carl A. Wiker (collectively, "Defendants"). We reverse the Order of the trial court and remand for further proceedings.

---

1. A bankruptcy trustee is the representative of the bankrupt estate, and has the capacity to sue and be sued. 11 U.S.C.A. § 323. Among the trustee's duties is the obligation to "collect and reduce to money the property of the estate." *Id.* § 704(1). The "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case," *id.* § 541(a)(1), including the debtor's "causes of action." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) (internal quotation marks and citation omitted). Contrary to the trial court's determination, Trustee does not represent the creditors of Le–Nature's.

The facts, as alleged in Trustee's Amended Complaint, are as follows. In 1992, Greg Podlucky ("Podlucky") founded Le–Nature's, Inc. ("Le–Nature's"), a Delaware corporation. Amended Complaint at ¶ 30. Le–Nature's held itself out as an innovator in the bottled beverage industry, in particular, its use of cutting edge technologies and distribution methods. *Id.* at ¶ 31.

In 2000 and in 2002, Le–Nature's issued over eight million shares of convertible preferred stock. *Id.* at ¶ 32. Two investment funds purchased shares: SW Pelham Fund, L.P. (affiliated with Smith Whiley & Company) (the "Pelham Fund"), and the George K. Baum Employee Equity Fund, L.P. (Affiliated with George K. Baum Merchant Banc, L.L.C.) (the "Baum Funds") (the Pelham Fund and the Baum Funds hereinafter collectively referred to as the "Minority Shareholders"). *Id.* The amended certificate governing the shares granted the Minority Shareholders the right to appoint directors ("Independent Directors") to the Board of Directors of Le–Nature's. Also on the Board were Podlucky and certain interested corporate officers (collectively, the "Inside Directors") (Inside Directors and Independent Directors collectively referred to as the "Board of Directors" or "Board"). *Id.* The Independent Directors were to approve all extraordinary capital expenditures and compel a sale of Le–Nature's by no later than September 2006. *Id.*

In August 2003, Ernst & Young ("E & Y"), Le–Nature's auditor, conducted its quarterly review of Le–Nature's financial statements. *Id.* at ¶ 33. Richard J. Lipovich ("Lipovich"), the E & Y audit partner responsible for the audit, met with Chief Financial Officer ("CFO") John Higbee ("Higbee"), Chief Administrative Officer ("CAO") Jennifer Fabry ("Fabry"), and Vice President of Administration Stacy Juchno ("Juchno") (collectively, "Senior Financial Managers"). *Id.* During the August 13, 2003 meeting, Lipovich solicited the concerns of Le–Nature's Senior Financial Managers regarding the company's financial activities, inquiring whether the Senior Financial Managers suspected fraudulent activity. *Id.* Such inquiries were part of standard E & Y audit procedures. *Id.* At this meeting, each member of Le–Nature' Senior Financial Managers expressed concerns about the accuracy of Le–Nature's sales figures. *Id.*

The next day, Higbee, a veteran auditor with more than 20 years of experience, resigned. *Id.* at ¶ 34. Fabry and Juchno also submitted written resignation letters to Le–Nature's Chief Executive Officer ("CEO"), Podlucky. *Id.* In their resignation letters, the Senior Financial Managers stated that they suspected Podlucky of engaging in improper conduct with Le–Nature's tea suppliers, equipment vendors and certain customers. *Id.* The Senior Financial Managers expressed serious concerns about recent "unusual" transactions "surrounding bulk tea sold in tankers and about possible unlawful collusion between Podlucky and the suppliers, vendors and customers." *Id.* In particular, the Senior Financial Managers reported a large increase in tea inventory and raw material, and the extraordinary level of "equipment deposits." *Id.*

In his resignation letter, CFO Higbee explained that he repeatedly had asked Podlucky for access to documentation supporting Le–Nature's general ledger details. *Id.* at ¶ 35. Podlucky's refusal, according to Higbee, constituted "an astonishing and extremely improper restriction for any chief executive officer to impose upon a company's chief financial officer." *Id.* Higbee explained that by conducting business transactions "without any normal review by others, such as

the CFO," Podlucky had rendered it impossible for Higbee to discharge his duties and responsibilities to Le–Nature's. *Id.* In conclusion, Higbee stated to Podlucky,

> I consider 1) the absolute control you maintain over the Company's detail[ed] financial records[,] 2) the lack of checks and balances related to deposits on equipment[,] 3) the lack of checks and balances related to deposits on tea leaf[, and] 4) the lack of checks and balances related to the sale of bulk tea concentrate and bulk tea leaf to be material weaknesses in the Company's internal controls.

*Id.*

Upon being informed of the concerns of Senior Financial Managers and their resignations, E & Y wrote a letter requesting that Le–Nature's hire "competent independent legal counsel to conduct a thorough and complete investigation of the allegation made by the [Senior Financial Managers]." *Id.* at ¶ 37 (emphasis omitted) (quoting E & Y Letter, 8/22/03). E & Y further advised Le–Nature's that, because of the resignations of the Senior Financial Managers, E & Y

> [would] be unable to be associated with any unaudited interim financial statements or historical audited financial statements, including issuing any consents or comfort letters, until the allegations are investigated thoroughly by independent counsel, we complete our review of the report of the investigation, we perform any additional procedures we consider necessary in the circumstances, and we interview the former employees[.]

Amended Complaint at ¶ 37 (emphasis omitted) (quoting E & Y Letter, 8/22/03).

On August 26, 2003, the Le–Nature's Board of Directors passed a unanimous consent resolution ("Resolution") declaring that it was *"in the best interest of the Company* to appoint a special committee of independent directors to conduct an investigation into the reasons underlying the resignations of the Senior Financial Managers." *Id.* at ¶ 38 (emphasis added). Accordingly, the Board of Directors unanimously consented to the creation of a special committee (the "Special Committee") to investigate the circumstances underlying the resignation of the Senior Financial Managers. *Id.* Of particular note, the Board's Resolution authorized the Special Committee to "provide findings and recommendations to the Board of Directors as a result of such investigation." Amended Complaint, Exhibit E (Resolution), at 1. The Board of Directors authorized the Special Committee to retain legal counsel and accountants "to assist in the investigation." Amended Complaint at ¶ 38 (emphasis added).

The Board appointed three independent, non-employee directors to serve on the Special Committee. *Id.* at ¶ 39. Lacking the expertise necessary to conduct internal corporate investigations, the Special Committee determined that "it was critical to retain *on behalf of the company,* legal counsel with experience in conducting such investigations." *Id.* at ¶ 40 (emphasis added). Ferguson, a partner at K & L Gates, represented to the members of the Special Committee "that he personally possessed precisely the type of investigative experience required by the Special Committee." *Id.* Relying on Ferguson's representations, the Special Committee retained K & L Gates to conduct the Le–Nature's investigation *"on behalf of the Company."* *Id.* (emphasis added). At its first meeting on August 28, 2003, the Special Committee authorized K & L Gates to investigate the circumstances underlying the resignation of the Senior Financial Managers. *Id.* at ¶ 41.

By a letter dated August 28, 2003 ("Retention Letter") to the Special Committee, K & L Gates confirmed its understanding of the scope of and nature of its engagement. The Retention Letter provided, in relevant part, as follows:

You have asked us to represent the Special Committee ("Special Committee") of the Outside directors of Le–Nature's Beverages, Inc. ("Company") in connection with a review of the circumstances attendant upon the recent resignation of three members of the finance staff of the company.

It is our Firm's practice to confirm in writing the identity of the client whom we represent, the nature of our undertaking on behalf of that client and our billing and payment arrangements with respect to our legal services.

**We understand that we are being engaged to act as counsel for the special committee and for no other individual or entity, including the Company or any affiliated entity, shareholder, director, officer or employee of the Company not specifically identified herein. We further understand that we are to assist the Committee in investigating the facts and circumstances surrounding the aforementioned resignations and assist the Special Committee in developing any findings and recommendations to be made to the full Board of the Company with respect thereto. The attorney-client relationship with respect to our work, including our work product, shall belong to the Committee. Only the Committee can waive any privilege relating to such work.**

Our firm currently represents Star Associates in connection with a contract dispute with the Company. This matter is substantively unrelated to the scope of the work of the Special Committee. We believe that our ongoing representation of Star Associates will not adversely affect our exercise of independent professional judgment on behalf of the Special Committee. Nonetheless, we will establish a "Chinese Wall" between those of our personnel working on the Star Associates matter and those working on the Special Committee matter. In view of the ongoing duties of loyalty we would owe to both Star Associates and the Special Committee, we wish to confirm at the outset of our engagement by the Special Committee that you concur with our conclusions set forth above and that you waive any potential or actual conflict of interest relating thereto.

. . .

It is our Firm's practice to render statements for professional services and related charges on a monthly basis. We will expect payment to be made within thirty days of your receipt of our statement, without regard to the outcome of any matter. In the event that our statements are not timely paid, we reserve the right to suspend our services until satisfactory payment arrangements are made or, if necessary, to terminate such services. Our clients, of course, may terminate our services at any time.

*Id.*, Ex. A at 1–2 (emphasis added).

Subsequently, K & L Gates retained P & W to assist in the investigation. P & W confirmed its understanding of the engagement in a letter to K & L Gates, dated September 12, 2003 (the "P & W Retention Letter"). The P & W Retention Letter provided, in relevant part, as follows:

**UNDERSTANDING OF P & W'S ROLE**

It is understood that P & W is being retained to assist K & L [Gates] as a financial expert related to the special investigation of certain transactions in-

volving Le[-]Nature's, Inc. [ ] **P & W shall provide general consulting, financial accounting, and investigative or other advice as requested by K & L [Gates] to assist it in rendering legal advice to Le[-]Nature's.** Acting as a consultant to counsel, we understand that all work and communications relating to this engagement are expected to be confidential and privileged and will be so treated unless otherwise directed by you, or required by law or court order.

### STAFFING AND FEES

. . .

P & W will render monthly invoices to K & L [Gates]. K & L [Gates] will then include our charges as part of its regular monthly invoices to Le[-]Nature's. We understand that under the terms of K & L [Gates's] engagement by Le[-]Nature's, K & L [Gates's] invoices are payable within thirty days of submission. We reserve the right to cease all work if any K & L [Gates] invoice to Le[-]Nature's becomes past due, without regard to the status of our services or any related procedures. K & L [Gates] will promptly pay our invoices as the funds therefore are received from Le[-]Nature's. It is understood that K & L [Gates] will not be otherwise responsible for payment of fees and expenses to P & W, as such responsibility ultimately rests with Le[-]Nature's, Inc.

*Id.,* Ex. B at 1–2 (emphasis added).

The Special Committee provided K & L Gates with, *inter alia,* the August 22, 2003 letter from E & Y, which requested that Le–Nature's conduct a competent, independent and thorough investigation of allegations made by the Senior Financial Managers. *Id.* at ¶¶ 36, 41. Ferguson led the investigation for K & L Gates. *Id.* at ¶ 42. Details of the investigation will be discussed in greater detail, *infra.*

On November 25, 2003, the Defendants provided a draft of their Report to Podlucky. *Id.* at ¶ 75. Podlucky was not a member of the Special Committee. *Id.* Notwithstanding the fact that the Special Committee had not received the Report, Podlucky immediately called a meeting of the Board of Directors for the purpose of discussing the draft Report. *Id.* Podlucky also provided comments on the draft Report to K & L Gates. *Id.* On December 5, 2003, K & L Gates provided the draft Report to the Special Committee. *Id.*

P & W approved the Report, which Ferguson then signed, representing that the Defendants "found no evidence of fraud or malfeasance with respect to any of the transactions" subject to the investigation. *Id.* at ¶¶ 76, 77 (emphasis omitted) (quoting Report at 1). The Special Committee attached a cover memorandum ("Memorandum") to the Report. Amended Complaint at ¶ 77. The Memorandum, which was reviewed by K & L Gates, stated the following:

> The Special Committee of the Board of Directors of [Le–Nature's] hereby submits the report attached herein prepared by the Committee's Counsel, [K & L Gates,] and its financial consultants[, P & W].

> The Special Committee was formed in August 2003 to investigate certain specific business transactions identified by three former [Le–Nature's Senior Financial Officer], all of whom resigned in mid-August 2003. The Special Committee consists of two outside directors who are representatives of the [Pelham Fund,] and one director representing [the Baum Fund].

> Upon the advice of [K & L Gates], the [Special] Committee limited the scope of its investigation to seven specific transactions identified by the [Senior Financial Managers] as areas of concern and

that could potentially impact [Le–Nature's] financial statements. . . .

The Committee is pleased to report that K & L [Gates] and P & W "found no evidence of fraud or malfeasance with respect to any of the transactions reviewed by it. Further[, K & L Gates] found no evidence which suggests that the transactions identified by the [Senior Financial Managers] as being of concern had not been properly reported on Le[-]Nature's financial statements." . . .

Memorandum at 1. The Memorandum included the recommendations proposed by K & L Gates. *Id.* at 2. The Memorandum concluded with the following pronouncement:

The [Special] Committee concurs strongly with all the recommendations outlined above.

We look forward to talking with the full Board of Directors on these recommendations and other findings of fact as soon as possible and to work with the Company in addressing the issues raised herein.

*Id.*

Throughout their investigation, the Defendants failed to uncover the massive fraud being perpetrated by Podlucky. Amended Complaint at ¶ 79. Podlucky and his senior managers continued to "loot" Le–Nature's, incurring further corporate debt and wasting corporate funds on avoidable transactions. *Id.* Podlucky and his senior management used the "no evidence of fraud" finding in the Report to retain their senior positions at Le–Nature's. *Id.*

However, between January 2004 and November 2006, Podlucky and his senior managers employed fraudulent schemes involving almost $200 million in equipment deposits. *Id.* at ¶ 80. Le–Nature's continued to add to its debt by, *inter alia,* building and commencing operations at unnecessary facilities. *Id.* at ¶¶ 81–83. In September 2006, Le–Nature's obtained a $285 million replacement line of credit through Wachovia. *Id.* at ¶ 83. Through 2005, Le–Nature's long-term secured debt increased to $275 million. *Id.* at ¶ 84. Le–Nature's continued borrowing funds, thereby substantially leveraging its assets and balance sheet. *Id.* at ¶ 84. By the end of 2005, Le–Nature's had production facilities in Latrobe, Pennsylvania and Phoenix, Arizona. *Id.* at ¶ 85. In late 2005, the Independent Directors learned that Podlucky intended to build a third facility in Florida. *Id.*

In May 2006, the Minority Shareholders of Le–Nature's, who were represented on the Board by the Independent Directors, commenced in Delaware Chancery Court an injunctive action against Le–Nature's and its four inside directors.[2] *Id.* The Chancery Court granted a preliminary injunction enjoining Le–Nature's from certain actions, including making capital expenditures outside the ordinary course of business, *i.e.,* in excess of $1,000, without the approval of the Minority Shareholders. *Id.*

Subsequently, in September 2006, Podlucky requested the assistance of Ferguson in preparing an initial public offering ("IPO") of Le–Nature's stock. *Id.* at ¶ 86. Ferguson, with the assistance of K & L Gates's London, England, office, commenced work on the IPO. *Id.* However, prior to October 19, 2006, the Independent Directors learned of a new allegation of fraud involving Le–Nature's. *Id.* at ¶ 87. A financial institution alleged that Le–Na-

---

**2.** (*George K. Baum Capital Partners, L.P. v. Le–Nature's Inc.,* Civil Action No. 2158–N) (Del. Ch.2006).

ture's had forged American International Group ("AIG") letters relating to the purchase of equipment for the company. *Id.* At the request of the Minority Shareholders, the Chancery Court granted a Temporary Restraining Order enjoining Le–Nature's from (a) making or incurring expenditures exceeding $1,000 without Board authorization; (b) accessing, tampering with or destroying any Le–Nature's' property; (c) selling, leasing or disposing of Company assets; (d) making or committing the Company to make any loans, advancements or investments; or (e) causing or committing the Company to incur any debt. *Id.*

Because the Temporary Restraining Order precluded Podlucky from proceeding with Le–Nature's IPO, Podlucky placed Ferguson in charge of negotiating with the Minority Shareholders to vacate the Chancery Court's Order. *Id.* at ¶ 88. Unable to reach an agreement, the Minority Shareholders and Independent Directors filed an application for the appointment of a receiver for Le–Nature's. *Id.*

On October 27, 2006, the Delaware Chancery Court appointed Kroll Zolfo Cooper, Inc. ("Kroll"), as custodian of Le–Nature's, placing it in charge of management and operations. *Id.* at ¶ 89. Within several days, Kroll uncovered massive fraud at Le–Nature's. *Id.* On November 1, 2006, Steven G. Panagos, a Kroll managing director, filed an affidavit with the Delaware Chancery Court setting forth the evidence of the financial fraud he had discovered at Le–Nature's. *Id.* at ¶ 90.

On November 1, 2006, several of Le–Nature's creditors initiated involuntary bankruptcy proceedings against Le–Nature's under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq.* Amended Complaint at ¶ 91. Kroll converted the proceedings from Chapter 7 to Chapter 11. *Id.* On July 8,

2008, the Bankruptcy Court issued an Order confirming a liquidation plan for Le–Nature's. *Id.* at ¶ 23. In accordance with the liquidation plan and the Bankruptcy Court's confirmation Order, the Bankruptcy Court created the Le–Nature's Liquidation Trust ("Trust") and appointed Trustee. *Id.* Under the liquidation plan, all assets and property of Le–Nature's, including all claims and causes of action, were conveyed to and retained by the Trust. *Id.* Trustee also uncovered the massive fraud perpetrated by Podlucky and other insiders. *Id.* at ¶ 93.

On September 9, 2009, Trustee filed, in the Court of Common Pleas of Allegheny County, a Civil Complaint against Defendants. Defendants filed Preliminary Objections demurring to all counts, after which Trustee filed an Amended Complaint. Again, Defendants filed Preliminary Objections demurring to the counts averred in the Amended Complaint. Trustee filed a response to Defendant's Preliminary Objections, and an objection to one of the Preliminary Objections filed by P & W. After oral argument, on December 28, 2010, the trial court entered an Order sustaining Defendants' Preliminary Objections and dismissing all counts of Trustee's Amended Complaint. Trial Court Order, 12/28/10. Thereafter, Trustee filed the instant timely appeal, followed by a court-ordered Concise Statement of matters complained of on appeal, in accordance with Pa.R.A.P. 1925(b).

On appeal, Trustee presents the following claims for our review:

1. Whether the Trial Court erred in dismissing [Trustee's] professional negligence claim against K & L Gates despite (a) the existence of an express or implied attorney-client relationship between [Le–Nature's] and K & L Gates and (b) [Trustee's] allegation that K & L Gates's wrongdoing directly and proxi-

mately caused cognizable and recoverable damages to [Le–Nature's] under Pennsylvania Law[?]

2. Whether the Trial Court erred in dismissing [Trustee's] breach of contract claim against K & L Gates despite [Trustee's] allegations of facts showing a contractual relationship between K & L Gates and [Le–Nature's] (either through the Special Committee or as a third-party beneficiary) and that the Company suffered damages resulting from the breach of contract[?]

3. Whether the Trial Court erred in dismissing [Trustee's] breach of fiduciary duty claim against K & L Gates where [Trustee] alleges facts establishing that K & L Gates owed a fiduciary duty to [Le–Nature's], which suffered damages as a result of the breach of that duty[?]

4. Whether the Trial Court erred in dismissing [Trustee's] negligent misrepresentation claim against [D]efendants despite [Trustee's] factual allegations that [D]efendants were professional firms in the business of supplying information, who provided false information concerning the absence of any evidence of fraud, and that [Le–Nature's], to its substantial financial harm, justifiably relied on their false information[?]

5. Whether the Trial Court erred in dismissing [Trustee's] vicarious liability claim against K & L Gates for the actions of P & W[,] despite [Trustee's] allegations of fact showing that a principal-agent or master-servant relationship was formed between K & L Gates and P & W[?]

6. Whether the Trial Court erred in dismissing [Trustee's] breach of contract claim against P & W despite allegations of fact showing that [Le–Nature's] was a third-party beneficiary of the K & L Gates–P & W agreement[?]

7. Whether [D]efendants' other preliminary objections, not addressed by the trial court's Opinion, are meritless or improper[?]

Brief for Appellant at 3–4.

■■■ As an initial matter, we are cognizant that "[a] preliminary objection in the nature of a demurrer is properly granted where the contested pleading is legally insufficient." *Cardenas v. Schober,* 783 A.2d 317, 321 (Pa.Super.2001) (citing Pa.R.C.P. 1028(a)(4)).

"Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer." [*Cardenas,* 783 A.2d] at 321–22. (citation omitted). All material facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true. *Id.* at 321.

> In determining whether the trial court properly sustained preliminary objections, the appellate court must examine the averments in the complaint, together with the documents and exhibits attached thereto, in order to evaluate the sufficiency of the facts averred. The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or abuse of discretion. When sustaining the trial court's ruling will result in the denial of claim or a dismissal of suit, preliminary objections will be sustained only where the case is free and clear of doubt.

*Cooper v. Frankford Health Care Sys.*, 960 A.2d 134, 143–44 (Pa.Super.2008) (quoting *Hess v. Fox Rothschild, LLP*, 925 A.2d 798, 805–06 (Pa.Super.2007), in turn quoting *Brosovic v. Nationwide Mut. Ins. Co.*, 841 A.2d 1071, 1073 (Pa.Super.2004)). This Court will not reverse a trial court's decision to sustain preliminary objections unless there has been an error of law or abuse of discretion. *Cornerstone Land Dev. Co. of Pittsburgh LLC v. Wadwell Group*, 959 A.2d 1264, 1266 (Pa.Super.2008).

■ Trustee first claims that the trial court erred in dismissing his legal malpractice/professional negligence claim against K & L Gates. Brief for Appellant at 20. In dismissing that cause of action, the trial court concluded that Trustee cannot establish a professional negligence claim against K & L Gates because of (a) the absence of an express or implied attorney-client relationship between K & L Gates and Le–Nature's, and (b) the absence of any losses to Le–Nature's caused by K & L Gates's failure to detect mismanagement. Trial Court Opinion, 12/28/10, at 13–14 We first review whether the averments of the Amended Complaint, taken as true, establish the existence of an attorney-client relationship between K & L Gates and Le–Nature's.

"A cause of action for legal malpractice contains three elements: the plaintiff's employment of the attorney or other grounds for imposition of a duty; the attorney's neglect to exercise ordinary skill and knowledge; and the occurrence of damage to the plaintiff proximately caused by the attorney's misfeasance." *Epstein v. Saul Ewing LLP*, 7 A.3d 303, 313 (Pa.Super.2010). Whether a duty exists under a particular set of facts is a question of law. *Campisi v. Acme Mkts.*, 915 A.2d 117, 119 (Pa.Super.2006). On questions of law, our standard of review is *de novo* and our

scope of review is plenary. *Epstein*, 7 A.3d at 313.

While the trial court recognized the existence of an express contract between K & L Gates and the Special Committee, the trial court concluded that the K & L Gates was retained "solely to protect the interests of the remaining equity holders[,]" *i.e.,* the investors, and not Le–Nature's. Trial Court Opinion, 12/28/10, at 13. In so holding, the trial court stated the following:

> Since [K & L Gates] was instructed *by the investors* to determine whether the other equity holder [*i.e.,* Podlucky,] was looting the company, the investors would have reasonably believed that the law firm was representing their interests, and only these interests, in investigating whether there was merit to the concerns of mismanagement on the part of Podlucky.
>
> In summary, the Trustee is not bringing this lawsuit on behalf of the investors whom [K & L Gates] was retained to protect. It is these investors to whom [K & L Gates] owed a duty of care and it is these investors who have a cause of action for malpractice.

*Id.* at 13–14 (emphasis added). We disagree. Contrary to the trial court's determination, the Amended Complaint avers the existence of an attorney-client relationship between K & L Gates and Le–Nature's.

As set forth above, the Retention Letter identified an attorney-client relationship between K & L Gates and the Special Committee. Although Le–Nature's is not identified as a client in the Retention Letter, Pennsylvania courts have recognized that

> [a]bsent an express contract, an implied attorney-client relationship will be found if 1) the purported client sought advice or assistance from the attorney; 2) the

advice sought was within the attorney's professional competence; 3) the attorney expressly or impliedly agreed to render such assistance; and 4) it is reasonable for the putative client to believe the attorney was representing him."

*Cost v. Cost,* 450 Pa.Super. 685, 677 A.2d 1250, 1254 (1996).

In reviewing Trustee's claim of an attorney-client relationship between K & L Gates and Le–Nature's, we are cognizant that Le–Nature's is a Delaware corporation. Delaware law provides that the board of directors has the ultimate responsibility for managing the business and affairs of a corporation. 8 Del. C. § 141(a). In discharging this function, the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173, 179 (Del.1986). The Delaware Supreme Court has held that "[t]o the extent that a contract, or a provision thereof, purports to require a board to act or not act in such a fashion as to limit the exercise of fiduciary duties, it is invalid and unenforceable." *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 51 (Del.1994). In this context, we review the nature of the duty undertaken by K & L Gates.

The averments of the Amended Complaint, taken as true, establish that Le–Nature's, acting through its Board and the Board's Special Committee, sought the legal advice and assistance of K & L Gates. Specifically, Le–Nature's sought K & L Gates's legal advice and assistance in investigating allegations of fraud, and in preparing findings and recommendations for action to be taken by Le–Nature's.

According to the Amended Complaint, the Board of Directors determined that it was in the best interests of Le–Nature's to create a special committee of the Board, which would investigate the allegations of fraud at Le–Nature's, and the resignations of the Senior Financial Managers. Amended Complaint at ¶ 38. Under Delaware law, a board of directors of a Delaware corporation may designate a committee, consisting of one or more directors of the corporation. 8 Del. C. § 141(c)(2). "Any such committee, to the extent provided in the resolution of the board of directors, or in the bylaws of the corporation, shall have and may exercise all the powers and authority of the board of directors in the management of the business and affairs of the corporation...." *Id.*

As a committee of the Board, the Special Committee had the fiduciary duty to act in the best interests of not only the shareholders, but also the corporation.[3] *See Revlon,* 506 A.2d at 179 (holding that directors owe fiduciary duties of care and loyalty to the corporation and shareholders). The Special Committee was vested with the power and authority of the Board to manage this specific aspect of the company's business affairs. *See* 8 Del. C. § 141(c)(2); *see also* Amended Complaint at ¶ 38, Exhibit E. Thus, the Special Committee acted on behalf of the Board and Le–Nature's in its investigation.

By its Resolution, the Board authorized the Special Committee to retain counsel to conduct an investigation "on behalf of the company." Amended Complaint at ¶ 38, Exhibit E (Resolution). K & L Gates was provided with a copy of the Board's Resolution. *See* Amended Complaint, Exhibit C (Report), at 4 (referencing the attached Resolution in the Report). Under Delaware law, the Board could not authorize

---

**3.** Contrary to the arguments of K & L Gates and Ferguson, no conflict of interest existed between Le–Nature's and the Special Committee as the Special Committee owed a fiduciary duty to act in the best interests of the company. *See Revlon,* 506 A.2d at 179.

the Special Committee to act solely on behalf of investors. Such authorization would violate the Board's fiduciary duty to Le–Nature's. *See Revlon,* 506 A.2d at 179 (holding that directors owe fiduciary duties of care and loyalty to the corporation *and* its shareholders and invalidating contracts that limit the exercise of such duties). Further, under Delaware law, the Special Committee only could act in the best interests of Le–Nature's *and* its shareholders. *See* 8 Del. C. § 141(c)(2) (providing that a committee of the board may exercise all of the powers of the board in the management and business affairs of the company); *Revlon,* 506 A.2d at 179.

According to the averments in the Amended Complaint, K & L Gates agreed to provide legal advice and assistance to Le–Nature's, through its Special Committee. K & L Gates's Retention Letter confirmed that (a) K & L Gates would provide legal assistance in investigating the fraud allegations; (b) K & L Gates would assist in preparing findings and recommendations; and (c) the findings and recommendations would be presented to the Board of Le–Nature's. Amended Complaint, Exhibit A (Retention Letter). In conformity with this undertaking, K & L Gates retained P & W to provide, *inter alia,* consulting, financial and investigative advice to K & L Gates **"to assist it in rendering legal advice to Le[-]Nature's."** Amended Complaint, Exhibit B (P & W Retention Letter) (emphasis added). K & L Gates agreed to bill Le–Nature's for its fees and those of P & W. Amended Complaint, Exhibit B (P & W Retention Letter).

Thus, the Amended Complaint avers that Le–Nature's, through a Special Committee of the Board of Directors, sought the legal advice and assistance of K & L Gates, and K & L Gates agreed to provide such advice and assistance. Specifically, Le–Nature's sought K & L Gates's legal advice and assistance in investigating allegations of fraud at Le–Nature's, and in preparing findings and recommendations in this regard. The parties do not dispute that the legal advice and assistance sought by Le–Nature's was within the professional competence of K & L Gates.

The averments of the Amended Complaint, taken as true, also establish that Le–Nature's reasonably believed that K & L Gates represented the *company's* interests. In addition to the foregoing, the Amended Complaint asserts that K & L Gates provided a draft of its Report not only to the Special Committee, but also to Podlucky. Amended Complaint at ¶ 75. Podlucky was not a member of the Special Committee. *See id.* at ¶ 39 (listing the directors appointed to the Special Committee).

After Ferguson signed and the Special Committee approved the final Report, the Special Committee forwarded it to the Board of Directors. *Id.* at ¶ 76. The cover memorandum attached to the final Report, which was reviewed by K & L Gates and directed to the Board of Directors, represented that K & L Gates found no evidence of fraud or malfeasance in the transactions reviewed. *Id.* at ¶ 78, Exhibit D. The cover memorandum further set forth K & L Gates's specific findings and recommendations for Le–Nature's. *Id.* By its actions, K & L Gates's confirmed that its duty extended beyond the Special Committee. Thus, these averments, in conjunction with the foregoing, establish the reasonableness of Le–Nature's belief that K & L represented the *company's* best interests, not just those of the Special Committee.

In summary, we conclude that the Trustee has averred the existence of an attorney-client relationship sufficient to impose a duty upon K & L Gates to Le–Nature's. The Amended Complaint and its exhibits

establish that (1) Le–Nature's, through its Board and Special Committee, sought K & L Gates's legal advice and assistance in investigating alleged fraudulent transactions and preparing findings/recommendations for the Le–Nature's Board; (2) the investigation of financial fraud and the preparation of findings and recommendations was within the professional competence of K & L Gates; (3) K & L Gates agreed to render such assistance to Le–Nature's, through its Board and Special Committee; and (4) it was reasonable for Le–Nature's to believe that K & L Gates was representing it in the investigation of fraud and the preparation of findings/recommendations. *See Cost*, 677 A.2d at 1254.

■ Trustee also challenges the trial court's conclusion that the Amended Complaint fails to aver cognizable and compensable damages to Le–Nature's. Brief for Appellant at 29–30. The trial court rejected Trustee's claim for damages because Le–Nature's was insolvent at the time K & L Gates prepared its Report in December 2003:[4]

> While [Trustee] contends that the increased insolvency is an actual corporate loss, [Trustee] does not offer any explanation as to how an already insolvent company was harmed because its insolvency increased by more than $500 million between December 2003 and October 2005....

*Id.* at 15. The trial court specifically observed that Le–Nature's *shareholders* were not harmed by the increased insolvency, as their interests had no value as of the date K & L Gates submitted its Report. *Id.* The trial court further rejected Trustee's claim for damages to the corporation, equating it to a claim for "deepen-

ing insolvency." *Id.* The trial court then rejected "deepening insolvency" as a legal basis for an award of tort damages:

> [The trial court] find[s] to be very persuasive—and believe[s] that the Pennsylvania appellate courts will also do so—the Opinion of the Court of Chancery of Delaware, New Castle County, in *Trenwick America Litigation Trust* [*v. Ernst & Young*, 906 A.2d 168 (Del.Ch. 2006), *aff'd* 931 A.2d 438 (Del.2007)], that rejected the concept of deepening insolvency.

Trial Court Opinion, 12/28/10, at 24. Contrary to the trial court's analysis, our review of the Amended Complaint discloses that Trustee does not claim damages for "deepening insolvency." Further, the damages claimed by Trustee are cognizable and compensable.

■ When it is alleged that an attorney has breached his professional obligations to his client, an essential element of the cause of action is proof of actual loss. *Sabella v. Milides*, 992 A.2d 180, 187 (Pa.Super.2010). Once the fact that damages occurred has been established, the jury is permitted to determine the extent of those damages. *Curran v. Stradley, Ronon, Stevens & Young*, 361 Pa.Super. 17, 521 A.2d 451, 455 (1987). Nevertheless, "the plaintiff has the burden of presenting sufficient evidence by which damages can be determined on some rational basis and other than by pure speculation or conjecture." *Id.*

Federal courts have coined the phrase "deepening insolvency" in describing the damages incurred by an already insolvent corporation. In *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267

---

**4.** Under federal bankruptcy law, a corporation is insolvent when the sum of the entity's debts is greater than all of the entity's property, at a fair valuation. 11 U.S.C.A. § 101(32)(A).

F.3d 340 (3d Cir.2001),[5] which arose out of the bankruptcy of two lease financing corporations that purportedly operated as a "Ponzi scheme," the Third Circuit Court of Appeals described "deepening insolvency" as a type of "injury to the Debtors' corporate property from the fraudulent expansion of corporate debt and prolongation of corporate life." *Id.* at 347. The concept presumes that, in taking on additional unpayable debt, a corporation might be harmed by operational limitations, strained corporate relationships, diminution of corporate assets, and the legal and administrative costs of bankruptcy. *Id.* at 349–50. The Third Circuit Court of Appeals predicted that where "deepening insolvency" causes damage to corporate property, the Pennsylvania Supreme Court would provide a remedy by recognizing a deepening insolvency cause of action. *Id.* at 351.

Five years later, the Third Circuit Court of Appeals clarified its decision in *Lafferty:*

> In [*Lafferty* ], we concluded that deepening insolvency was a valid Pennsylvania cause of action. Although we did describe deepening insolvency as a "type of injury," and a "theory of injury," we never held that it was a valid theory of *damages* for an independent cause of action. Those statements in *Lafferty* were in the context of a deepening insolvency *cause of action*. They should not be interpreted to create a novel theory of damages for an independent cause of action like malpractice.

*Seitz v. Detweiler, Hershey and Assoc., P.C. (In re CitX Corp.),* 448 F.3d 672, 676 (3d Cir.2006) (emphasis added) (citations omitted). However, the Court of Appeals observed that "[w]here an independent cause of action gives a firm a remedy for the increase in its liabilities, the decrease in fair asset value, or its lost profits, then the firm may recover, without reference to the incidental impact upon the solvency calculation." *Id.* at 678 (citation omitted).

In *CitX*, the federal appeals court (and the trial court herein) referred to an article frequently quoted on the subject of "deepening insolvency": Sabin Willet, *The Shallows of Deepening Insolvency*, 60 Bus. Lawyer 549 (2005). As this article explains,

> injury to solvency is an incident to the harm, not the harm itself. If the [corporation] lost asset value through defendant's conversion of property, the law measures damage; if through breach of contract, commission of tort, breach of fiduciary duty, or fraudulent transfer, the law already measures damage. The damages may include the insult to asset values . . . or the accumulation of a liability. . . . Depending on the underlying law, the damage may or may not also include lost profits. . . . Solvency analysis will be incidental to all of these damage analyses. It may so happen that the diminished asset value, new liability, or lost profits that measures the damage also measures precisely the deepening of the firm's insolvency. *The point is that insolvency analysis adds nothing to the measure of damages the law already allows.*

*Id.* at 575 (emphasis added).

Since *CitX*, the Third Circuit continues to recognize the validity of traditional tort damages, even when those damages increase a corporation's insolvency. *See Thabault v. Chait,* 541 F.3d 512, 523 (3d

---

**5.** "Decisions of the federal district courts and courts of appeals, including those of the Third Circuit Court of Appeals, are not binding on Pennsylvania courts, even when a federal question is involved." *Chiropractic Nutrition-* *al Assocs. v. Empire Blue Cross & Blue Shield,* 447 Pa.Super. 436, 669 A.2d 975 (1995). However, Pennsylvania courts may look to the federal courts for guidance.

Cir.2008) (recognizing as cognizable traditional tort damages even when the corporation is insolvent); *see also id.* at 525 (recognizing that an increase in liabilities is a harm to the company); *Fehribach v. Ernst & Young LLP,* 493 F.3d 905, 909 (7th Cir.2007) (recognizing that the defendant auditors owed a duty to the company, and that the duty does not "evaporate just because the client is bankrupt and any benefits from suing will accrue to its creditors.").

We find the rationale expressed by the federal appeals court in *CitX* and *Thabault* helpful to our determining the type of damages sought by Trustee. Our review of the Amended Complaint discloses that Trustee has not claimed "deepening insolvency," either as a separate cause of action or as a separate theory of damages. Trustee does not allege that Le–Nature's insolvency at the time of the alleged tortious conduct created additional damages or negated the harm caused by the allegedly tortious conduct. Rather, Trustee seeks tort damages for Le–Nature's increased liabilities, decreased asset values and losses proximately caused by the professional negligence of K & L Gates. Amended Complaint at ¶¶ 22, 79–84, 94, 107.

Upon review, we conclude that Trustee seeks traditional tort damages. The fact of Le–Nature's insolvency does not negate the harm allegedly resulting from K & L Gates's professional negligence. *See* 37 Pennsylvania Law Encyclopedia, Torts § 4, at 120 (1961) (recognizing the basic legal principle in this Commonwealth that "for every legal wrong there must be a correlative legal right."). Accordingly, we conclude that Trustee has averred legally compensable and cognizable damages for the alleged professional negligence.[6]

Trustee also argues that the averments of the Amended Complaint establish that K & L Gates's professional negligence proximately caused the harm alleged. Brief for Appellant at 38. Proximate cause must "be determined by the judge and it must be established before the question of actual cause is put to the jury." *Brown v. Philadelphia College of Osteopathic Med.,* 760 A.2d 863, 868 (Pa.Super.2000). "Proximate causation" in a legal malpractice action has been defined as "that which, in a natural and continuous sequence, unbroken by any sufficient intervening cause, produced injury, and without which the result would not have occurred." *Fiorentino v. Rapoport,* 693 A.2d 208, 217 (Pa.Super.1997) (citation omitted).

To determine proximate cause, "the question is whether the defendant's conduct was a 'substantial factor' in producing the injury." *Brown,* 760 A.2d at 869. A defendant will not be found to have had a duty to prevent a harm that was not a reasonably foreseeable result of the prior negligent conduct. *Fiorentino,* 693 A.2d at 217 (citation omitted). Unless the evidence is such that reasonable people cannot disagree, the question of whether a defendant's conduct is the cause of the plaintiff's injury or loss is for the jury. *Curran,* 521 A.2d at 454.

The trial court concluded that Trustee had failed to establish proximate causation, because *the creditors* did not rely on K & L Gates's Report in making their decisions, as they were unaware of the Report. Trial Court Opinion, 12/28/10, at 31–32. The trial court concluded that "[c]onsequently, the losses of the new creditors were not caused by K & L [Gates's] malpractice." *Id.* at 32. However, as set

---

**6.** Despite the fact that other courts may have determined that similar complaints involving Le–Nature's have alleged deepening insolvency as damages, we conclude that the Complaint before this Court does not, under Pennsylvania law.

forth above, Trustee brings this cause of action on behalf of Le–Nature's, not its creditors. Thus, we consider whether the Amended Complaint establishes that the professional negligence of K & L Gates proximately caused harm to Le–Nature's.

To determine whether any breach of duty proximately caused a plaintiff's damages, this Court looks to whether a reasonable person would infer that the injury was the natural and probable result of defendant's breach of duty. *Commerce Bank v. First Union Nat. Bank,* 911 A.2d 133, 142 (Pa.Super.2006). Regarding proximate causation, the Amended Complaint avers that if K & L Gates properly had performed its duty to Le–Nature's, *i.e.,* by conducting a proper investigation and issuing an appropriate report,

> Le–Nature's would have avoided Podlucky's massive looting of the Company and the several financings and leasing obligations misused by Podlucky and the other Insiders. Had they discharged their duties and obligations properly, Defendants would have informed the Independent Directors of the widespread fraud at the Company and the Independent Directors would have sought immediate judicial intervention and obtained in late 2003 or early 2004, the restraining and other orders secured in 2006. Such actions clearly would have prevented the unnecessary financings and closed down the Company, which would have liquidated a failed enterprise and preserved significant asset value.

Amended Complaint at ¶ 94.

According to the Amended Complaint, Podlucky's fraud and looting were occurring during the investigation, and continued unimpeded as a result of K & L Gates's deficient investigation. *Id.* at ¶ 79. The Amended Complaint asserts that, as a direct result of K & L Gates's deficient investigation and misleading report, the

Independent Directors were misled into a belief that the allegations of improper conduct were unfounded. *Id.* at ¶ 96. In addition, the Amended Complaint alleges that K & L Gates concealed the wrongdoing, causing the Independent Directors to relax their vigilance. *Id.* at ¶ 97. The Amended Complaint avers that

> [a]s a direct, proximate and foreseeable result of [K & L Gates's] wrongdoing, [Le–Nature's] has suffered substantial damages totaling more than $500 million that the Insiders looted from the Company or wasted on avoidable transactions after the issuance of the Report.

*Id.* at ¶ 107. According to the Amended Complaint, these damages were reasonably foreseeable and K & L Gates's malpractice enabled Podlucky and the interested directors to continue their fraudulent activity. *Id.* at ¶ 109.

K & L Gates was retained to investigate the exact type of injury being inflicted upon Le–Nature's. By negligently conducting its investigation, K & L Gates affirmatively caused harm to Le–Nature's, by concealing the looting of the Company and wrongdoing by Podlucky, and affirmatively representing that no evidence of fraud or misconduct existed. The foregoing allegations are sufficient to establish that K & L Gates's malpractice was a substantial factor in causing harm to Le–Nature's in the form of increased liabilities, decrease in the value of assets, additional looting of the company and corporate waste, all of which were permitted to continue because of the malpractice. Because the Amended Complaint alleges that the looting of the company and waste were ongoing, we cannot conclude as a matter of law that the alleged damages were too remote.

For these reasons, we conclude that the trial court erred in sustaining the Preliminary Objections of K & L Gates as to

Count I—Professional Negligence. Trustee's Amended Complaint avers a *prima facie* cause of action for professional negligence against K & L Gates.[7]

■■■ Trustee next claims that the trial court erred in dismissing Trustee's breach of contract claim against K & L Gates. Brief for Appellant at 44. In rejecting Trustee's breach of contract claim, the trial court concluded that K & L Gates's contract was with the Special Committee, and that "[t]here are no other interests that K & L [Gates] would have been reasonably expected to protect." Trial Court Opinion, 10/28/10, at 32. As a basis for its conclusion, the trial court incorrectly opined that the Special Committee represented the interests of the holders of Le–Nature's preferred stock, and that it would have been obvious to K & L Gates that its responsibilities were to protect the interests of the preferred shareholders. *Id.* The trial court also concluded that Le–Nature's was not a third-party beneficiary of K & L Gates's agreement with the Special Committee, and that the Amended Complaint fails to describe any harm to Le–Nature's caused by K & L Gates's breach of its duty of reasonable care. *Id.* at 33.

■■■ A breach of contract action involves (1) the existence of a contract, (2) a breach of a duty imposed by the contract, and (3) damages. *Zokaites Contr., Inc. v. Trant Corp.*, 968 A.2d 1282, 1287 (Pa.Super.2009). A claim based on breach of an attorney-client agreement is a contract claim, and the attorney's liability must be assessed under the terms of the contract. *Fiorentino*, 693 A.2d at 213. "[A]n attorney who agrees for a fee to represent a client is by implication agreeing to provide

that client with professional services consistent with those expected of the profession at large." *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 565, 571 (Pa.Super.2007) (citation omitted).

As discussed above, the Amended Complaint avers the existence of an agreement between K & L Gates and Le–Nature's. Specifically, K & L Gates agreed to provide its professional services to Le–Nature's, in the form of an investigation of fraud and certain improper financial transactions. K & L Gates's Retention Letter confirmed that (a) K & L Gates would provide legal assistance in investigating the fraud allegations; (b) K & L Gates would assist in preparing findings and recommendations; and (c) the findings and recommendations would be presented to the Board of Le–Nature's. Amended Complaint, Exhibit A (Retention Letter). K & L Gates billed Le–Nature's for its services and Le–Nature's paid for those services. Amended Complaint at ¶ 42. Confirming the nature of K & L Gates's agreement with Le–Nature's, K & L Gates retained P & W to provide, *inter alia*, consulting, financial and investigative advice to K & L Gates "**to assist it in rendering legal advice to Le[-]Nature's.**" Amended Complaint, Exhibit B (P & W Retention Letter) (emphasis added).

The Amended Complaint also avers that K & L Gates breached the duty imposed under the agreement when it failed to provide Le–Nature's with professional services consistent with those expected of the profession at large. In support, the Amended Complaint avers, *inter alia*, that

(a) Ferguson misrepresented his investigation expertise, and he directed a li-

---

7. We acknowledge K & L Gates's arguments that corporate waste does not show harm to Le–Nature's, and that K & L Gates's investigation was too remote in time and fact from

the alleged injuries. Such claims appear to raise issues of fact, which are better addressed in a motion for summary judgment or at trial.

brarian at his law firm to identify and obtain copies of articles discussing how a corporate investigation should be conducted, *see* Amended Complaint at ¶ 44; (b) Despite the serious allegations and resignations of the Senior Financial Managers, and the widespread nature of the allegations, K & L Gates improperly limited the scope of its investigation to a number of discrete transactions; *see id.* at ¶ 49; (c) Despite allegations that virtually all of the suspected improper activity implicated Podlucky, K & L Gates allowed Podlucky to play an integral role in the investigation, including allowing Podlucky to control the documents that would be produced in the investigation and the process for interviewing witnesses, *see id.* at ¶ 50; (d) Despite allegations that virtually all of the suspected improper activity implicated Podlucky, K & L Gates channeled all document requests through Podlucky, and knew that he failed to produce all of the requested documents, *see id.* at 51; (e) Despite allegations that virtually all of the suspected improper activity implicated Podlucky, K & L Gates deferred to Podlucky for his explanations and assistance in investigating the improper activities, and repeatedly relied upon those uncorroborated explanations, *see id.;* (f) Despite allegations that virtually all of the suspected improper activity implicated Podlucky, K & L Gates agreed to provide Podlucky or his attorney with a description of the topics that K & L Gates intended to address during employee interviews, "thus enabling Podlucky to coach those witnesses before their interviews[,]" *see id.* at ¶ 52; and (g) K & L Gates conducted only limited non-employee interviews, improperly accepting Podlucky's pretextual reasoning, and acceded to Podlucky's unreasonable demand prohibiting follow-up interviews regarding material matters in the investigation, *see id.*

The Amended Complaint also identifies specific suspicious and fraudulent activities and transactions that should have been discovered by K & L Gates, had it conducted the promised investigation. *Id.* at ¶¶ 53–73.

The Amended Complaint further avers that K & L Gates breached its duties and obligations under the contract by, *inter alia,* failing to fulfill the engagement they agreed to undertake pursuant to the contract; improperly limiting the scope of the investigation and accepting limitations on the investigation; improperly permitting the suspected wrongdoers to dictate and limit the manner in which the investigation was conducted; improperly failing to interview material third-party witnesses and obtain independent third-party documentation regarding the challenged transactions; improperly relying on corporate insiders' self-serving and uncorroborated presentations; improperly suspending the investigation before it was completed; issuing a false and misleading Report despite being provided with substantial evidence of improper conduct and indications of fraud, and despite being provided with forged and backdated documents. *Id.* at ¶ 116.

Additionally, the Amended Complaint alleges that K & L Gates's breach caused Le–Nature's to suffer actual damages totaling more than $500 million, which the insiders looted from the Company or wasted on avoidable transactions. *Id.* at ¶ 118. According to the Amended Complaint, the damages were reasonably foreseeable and could not have been discovered by Le–Nature's with the exercise of due diligence until the Kroll investigation. *Id.* at ¶ 120.

Based upon the foregoing, we conclude that the trial court erred in sustaining K & L Gates's preliminary objection as to Count II–Breach of Contract. The Amended Complaint avers a legally sufficient breach of contract action against K & L Gates.

Trustee next claims that the trial court improperly dismissed his claim that K & L Gates breached its fiduciary duty to Le–Nature's. Brief for Appellant at 48. According to Trustee, the Amended Complaint alleges the existence of a fiduciary relationship between K & L Gates and the Company, "and that K & L Gates's negligent failure to act in good faith and solely for the benefit of the Company was a real factor in [Le–Nature's] harm." *Id.* (citing Amended Complaint at ¶¶ 123–32). Trustee contends that the trial court erred in concluding that K & L Gates's fiduciary duty, if any, was owed only to the Special Committee and Minority Shareholders, not Le–Nature's. Brief for Appellant at 48. Thus, Trustee claims that the Amended Complaint establishes a fiduciary duty owed by K & L Gates to Le–Nature's. *Id.* We agree.

"It is axiomatic that an attorney who undertakes representation of a client owes that client both a duty of competent representation and the highest duty of honesty, fidelity, and confidentiality." *Capital Care Corp. v. Hunt*, 847 A.2d 75, 84 (Pa.Super.2004). Such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable. *Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1283 (1992). In *Maritrans,* our Supreme Court drew support from the United States Supreme Court, which set forth the following observations in an early decision:

There are few of the business relations of life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.

*Id.* (quoting *Stockton v. Ford,* 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676 (1850)).

The Amended Complaint asserts the existence of a fiduciary duty owed by K & L Gates to Le–Nature's, based upon their attorney-client relationship. Amended Complaint at ¶ 124. As discussed *supra,* the allegations of the Amended Complaint and its exhibits establish the existence of an attorney-client relationship between Le–Nature's and K & L Gates. The Amended Complaint avers that (1) Le–Nature's (through its Board and Special Committee) sought K & L Gates's legal advice and assistance in investigating alleged fraudulent transactions and preparing findings/recommendations for the Le–Nature's Board and, ultimately, Le–Nature's; (2) the investigation of financial fraud and the preparation of findings and recommendations was within the professional competence of K & L Gates; (3) K & L Gates agreed to render such assistance to Le–Nature's, through its Board and Special Committee; and (4) it was reasonable for Le–Nature's to believe that K & L Gates was representing it in the investigation of fraud and the preparation of findings/recommendations. *See Cost,* 677 A.2d at 1254. Based upon the existence of an attorney-client relationship, we conclude that the trial court erred when it determined that no fiduciary relationship

existed between Le–Nature's and K & L Gates.

Further, the Amended Complaint avers that K & L Gates breached its fiduciary duty by failing to act in good faith in accordance with the standard of care ordinarily provided by professionals when providing legal representation. Amended Complaint at ¶ 124; *see Maritrans GP, Inc.*, 602 A.2d at 1283 (describing the fiduciary duty owed by attorneys to their clients and stating that "attorneys are bound ... to perform their fiduciary duties properly. Failure to so perform gives rise to a cause of action ... [and] ... such duty demands undivided loyalty and prohibits the attorney from engaging in conflicts of interest, and breach of such duty is actionable."). The Amended Complaint asserts, *inter alia,* that K & L Gates breached its duty of care by not conducting a reasonable and competent investigation; by violating its duty of undivided loyalty by becoming beholden to the principal suspected wrongdoer, Podlucky; by allowing Podlucky and other insiders to become clients of the law firm; by allowing Podlucky to dictate the manner of conducting the investigation, including allowing Podlucky to control interviews and document requests; by providing a false and misleading report. Amended Complaint at ¶¶ 125–27.

Finally, the Amended Complaint avers that K & L Gates's breach of its fiduciary duty was a substantial factor in causing Le–Nature's to sustain more than $500 million in damages, such damages were proximately caused by K & L Gates's breach of its fiduciary duty, and the damages were foreseeable. *Id.* at ¶¶ 128, 129. Based upon the foregoing, we conclude that Count III of the Amended Complaint, alleging a breach of fiduciary duty, is legally sufficient. Accordingly, we conclude

that the trial court erred in dismissing this count of the Amended Complaint.

■ Trustee next claims that the trial court improperly dismissed his claim of negligent misrepresentation against Defendants. Brief for Appellant at 50. According to Trustee, the trial court premised its ruling on its findings that "the only persons who relied on the Report and its misrepresentations were the Minority Shareholders[.]" *Id.* (citing Trial Court Opinion, 12/28/10, at 35). Trustee challenges this conclusion, and further challenges the trial court's conclusion that a claim of negligent misrepresentation cannot be made in the absence of an attorney-client relationship. Brief for Appellant at 50.

As set forth above, we conclude that the Amended Complaint has averred the existence of an attorney-client relationship between Le–Nature's and K & L Gates. Further, the Amended Complaint avers a sufficient basis upon which to hold K & L Gates and P & W liable for negligent misrepresentation.

In *Bilt–Rite Contrs., Inc. v. Architectural Studio,* 581 Pa. 454, 866 A.2d 270 (2005), the Pennsylvania Supreme Court adopted Restatement (Second) of Torts Section 552 as the law in Pennsylvania "where information is negligently supplied by one in the business of supplying information[.]" *Bilt–Rite Contrs.,* 866 A.2d at 287. Section 552, entitled "Information Negligently Supplied for the Guidance of Others," provides, in relevant part, as follows:

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise

reasonable care or competence in obtaining or communicating the information. (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552. In adopting Section 552, our Supreme Court explained that

Section 552 sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities. The tort is narrowly tailored, as it applies only to those businesses which provide services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs. The Section imposes a simple reasonable man standard upon the supplier of the information. As is demonstrated by the existing case law from Pennsylvania and other jurisdictions, and given the tenor of modern business practices with fewer generalists and more experts operating in the business world, business persons have found themselves in a position of increasing reliance upon the guidance of those possessing special expertise. Oftentimes, the party ultimately relying upon the specialized expertise has no direct contractual relationship with the expert

supplier of information, and therefore, no contractual recourse if the supplier negligently misrepresents the information to another in privity. And yet, the supplier of the information is well aware that this third party exists (even if the supplier is unaware of his specific identity) and well knows that the information it has provided was to be relied upon by that party. Section 552 is not radical or revolutionary; reflecting modern business realities, it merely recognizes that it is reasonable to hold such professionals to a traditional duty of care for foreseeable harm.

*Bilt–Rite,* 866 A.2d at 285–86. Here, Trustee has asserted that Defendants negligently provided information that it know will be relied upon Le–Nature's in its business endeavors, and that said reliance was foreseeable.

According to the Amended Complaint, P & W acknowledged its understanding that "P & W is being retained to assist K & L as a financial expert related to the special investigation of certain transactions involving Le[-]Nature's, Inc. [ ] **P & W shall provide general consulting, financial accounting, and investigative or other advice as requested by K & L to assist in it rendering legal advice to Le[-]Nature's.**" Amended Complaint, Ex. B, at 1 (emphasis added). P & W further confirmed that its fees would be paid by Le–Nature's. Amended Complaint, Ex. B, at 1–2. Thus, P & W expressly confirmed its understanding that the information it provided would ultimately be used to give legal advice to Le–Nature's and Le–Nature's would pay for this information.

The Amended Complaint alleges that K & L Gates and P & W drafted and edited the Report, which contained numerous misrepresentations. Amended Complaint at ¶¶ 135, 136. The Amended Complaint specifically identifies the alleged material

misrepresentations made by Defendants in the Report. *Id.* at ¶¶ 136, 137. According to the Amended Complaint, Defendants knew/reasonably should have known that the alleged misrepresentations were false and misleading, and that Le–Nature's, through its Board and Special Committee, would rely on those misrepresentations. *Id.* at ¶¶ 138–40. The averments of the Amended Complaint claim that Le–Nature's justifiably relied upon the misrepresentations and that the negligent misrepresentations foreseeably and proximately caused more than $500 million in damages. *Id.* at ¶¶ 141–43.

Thus, the Amended Complaint avers a legally sufficient cause of action for negligent misrepresentation. On this basis, we reverse the trial court's dismissal of Count IV of the Amended Complaint, which claimed negligent misrepresentation against Defendants.

■■■■ Trustee next claims that the trial court erred in dismissing his vicarious liability claim against K & L Gates. Brief for Appellant at 53. Specifically, Trustee challenges the trial court's statement that "[i]t does not matter whether or not K & L [Gates] is responsible for the conduct of [P & W] because of [the trial court's] rulings that K & L [Gates] owed obligations only to the members of the Special Committee and the persons whose interests they represented." *Id.* (quoting Trial Court Opinion, 12/28/10, at 36).

Trustee claims that K & L Gates is vicariously liable for P & W's negligence based on a principal-agent or master-servant relationship. Brief for Appellant at 53. According to Trustee, the Amended Complaint alleges facts demonstrating the excessive control exercised over P & W by K & L Gates. *Id.* at 54. Of note, Trustee directs our attention to allegations that K & L Gates instructed P & W as to the tasks and its responsibilities; that K & L

Gates could terminate the hourly employees of P & W; that P & W was required to seek advance approval from K & L Gates regarding its investigative methods; and that P & W funneled its requests for additional company documents through K & L Gates. *Id.; see also* Amended Complaint at ¶¶ 43, 167.

K & L Gates counters by directing our attention to the trial court's conclusion that it owed no duties to Le–Nature's and that Le–Nature's suffered no cognizable injury. Brief for Appellees (K & L Gates and Ferguson) at 53–54. K & L Gates further argues that it is not liable for P & W's actions as a matter of law. *Id.* at 54. In support, K & L Gates contends that "no legal basis exists for imposing vicarious liability on a lawyer if an independent expert he retains should fail to satisfy the standard of care applicable to *the expert's* profession." *Id.* (emphasis in original).

In its Opinion, the trial court rejected Trustee's claim of vicarious liability against K & L Gates, and stated the following:

> It does not matter whether or not K & L is responsible for the conduct of [P & W] because of my rulings that K & L owed obligations only to the members of the Special Committee and the persons whose interests they represented.

> Also, for the reasons given in my discussion of Count I, the Amended Complaint does not describe any harm that the corporation suffered as a result of the breach by K & L [Gates] and its agents of a duty to exercise reasonable care.

Trial Court Opinion, 12/28/10, at 36.

As set forth above, we conclude that the Amended Complaint avers a legally sufficient basis for concluding that K & L Gates owed a duty to Le–Nature's, and that K & L Gates's breach of that duty proximately caused harm to Le–Nature's.

We further conclude that Le–Nature's has asserted a viable cause of action holding K & L Gates vicariously liable for the negligence of P & W.

Initially, we observe that

not every relationship of principal and agent creates vicarious responsibility in the principal for acts of the agent. A principal and agent can be in the relationship of a master and servant, or simply in the status of two independent contractors. If a particular agent is not a servant, the principal is not considered a master who may be held vicariously liable for the negligent acts of the agent.... A servant, in law, is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control. It is not ... the fact of actual interference or exercise of control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor. It is the exclusive function of the jury to determine, from the evidence, the precise nature of the relationship, except where the facts are not in dispute, in which latter event the question becomes one for determination by the court.

*Myszkowski v. Penn Stroud Hotel*, 430 Pa.Super. 315, 634 A.2d 622, 625 (1993) (citations and quotation marks omitted). *Accord Valles v. Albert Einstein Med. Ctr.*, 758 A.2d 1238, 1244 (Pa.Super.2000).

Here, the allegations of the Amended Complaint, taken as true, establish the existence of a master-servant relationship between K & L Gates and P & W. The Amended Complaint avers that P & W was selected to assist K & L Gates as a financial expert in investigating certain transactions involving Le–Nature's; that K & L Gates dictated the parameters of P & W's work on a daily basis; that K & L Gates set the interview schedules, provided assignments and deadlines to P & W for the work; that K & L Gates approved the investigative methods employed by P & W; and that K & L Gates selectively communicated P & W's findings to Le–Nature's; and that K & L Gates would include P & W's charges as part of K & L Gates's monthly invoices to Le–Nature's. Amended Complaint a ¶ 143.

The Amended Complaint further avers that K & L Gates controlled the tasks and responsibilities of P & W and its employees during the investigation; that K & L Gates could terminate P & W's hourly employees assigned to the investigation; that P & W funneled its requests for documents through K & L Gates; that K & L Gates dictated to P & W the schedule for the investigation including meetings, interview and deadlines for comments on draft reports; that K & L Gates dictated the scope of the transactions investigating, requiring status reports of P & W's findings; and that K & L Gates controlled P & W's use of outside resources. *Id.* at ¶ 167.

We conclude that the averments of the Amended Complaint establish that K & L Gates retained an extensive right to interfere with and control P & W's performance. *See Myszkowski*, 634 A.2d at 625. On this basis, we conclude that the Amended Complaint alleges a master-servant relationship sufficient to establish K & L Gates's vicarious liability for damages proximately caused by P & W's negligent performance.

█ Trustee next claims that the trial court improperly dismissed his third-party beneficiary claim against P & W. Brief for Appellant at 55. According to Trustee, the trial court concluded that P & W's Retention Letter failed to establish that either P

& W or K & L Gates intended to give the benefit of P & W's performance to anyone other than the Special Committee and Minority Shareholders. *Id.* (citing Trial Court Opinion, 12/28/10, at 37). Based upon our review of the Amended Complaint and the P & W Retention Letter, we conclude that the trial court erred.

■■■ "In order for a third party beneficiary to have standing to recover on a contract, both ˙contracting parties must have expressed an intention that the third party be a beneficiary, and that intention must have affirmatively appeared in the contract itself." *Scarpitti v. Weborg,* 530 Pa. 366, 609 A.2d 147, 149 (1992). Furthermore,

> to be a third party beneficiary entitled to recover on a contract it is not enough that it be intended by *one* of the parties to the contract and the *third person* that the latter should be a beneficiary, but *both parties to the contract* must so intend and must indicate that intention in the contract; in other words, a promisor cannot be held liable to an alleged beneficiary of a contract unless the latter was within his contemplation at the time the contract was entered into and such liability was intentionally assumed by him in his undertaking.

*Spires v. Hanover Fire Ins. Co.,* 364 Pa. 52, 70 A.2d 828, 830–31 (1950) (emphasis in original). While *Spires* was overruled by *Guy v. Liederbach,* 501 Pa. 47, 459 A.2d 744 (1983), it was only overruled "to the extent that it states the exclusive test for third party beneficiaries." *Id.* at 751; *accord Burks v. Fed. Ins. Co.,* 883 A.2d 1086, 1088 (Pa.Super.2005).

■■■ In *Guy,* our Supreme Court established a "narrow class of third party beneficiaries." *Scarpitti,* 609 A.2d at 151. This narrow exception established a "restricted cause of action" for third party beneficiaries by adopting Section 302 of the Restatement (Second) of Contracts (1979). *Scarpitti,* 609 A.2d at 151. Section 302 involves a two-part test to determine whether one is a third party beneficiary to a contract, which requires that (1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. *Guy,* .459 A.2d at 751 (quotation marks omitted); *accord Burks v. Fed. Ins. Co.,* 883 A.2d 1086, 1088 (Pa.Super.2005). Thus, even when the contract does not expressly state that the third party is intended to be a beneficiary, the party may still be a third party beneficiary under the foregoing test. *Burks,* 883 A.2d at 1088. "But *Guy* did not alter. the requirement that in order for one to achieve third party beneficiary status, that party must show that both parties to the contract so intended, and that such intent was within the parties' contemplation at the time the contract was formed." *Id.*

Here, the recognition of Le–Nature's rights under P & W's Retention Letter and K & L Gates's Retention Letter are appropriate to effectuate the intention of the parties. Further, the circumstances indicate that K & L Gates and P & W intended to give Le–Nature's the benefit of the promised performance. P & W's Retention Letter expressly acknowledged P & W's understanding that it was retained to assist K & L Gates in investigating certain transactions involving Le–Nature's. P & W Retention Letter at 1. The P & W Retention letter stated that "P & W shall provide general consulting, financial accounting, and investigative or other advice as requested by K & L **to assist it in rendering legal advice to Le[-]Na-**

ture's." *Id.* (emphasis added). Thus, P & W confirmed its intention to assist in providing legal advice to Le–Nature's.

Further, through its own Retention Letter, K & L Gates expressed an intention to benefit Le–Nature's in performing its duties under that agreement. Through the K & L Gates Retention Letter, K & L Gates expressed an intention to provide legal advice and assistance to Le–Nature's, through its Special Committee. K & L Gates's Retention Letter confirmed that K & L Gates would provide legal assistance in investigating the allegations of fraud, and assist in preparing findings and recommendations that would be presented to Le–Nature's Board. Amended Complaint, Exhibit A (Retention Letter). Accordingly, the trial court improperly dismissed Trustee's third-party beneficiary claim against P & W. The Amended Complaint's averments are sufficient to establish Le–Nature's status an intended third-party beneficiary of that agreement.

■■■ Finally, Trustee asks this Court to address whether, as a matter of law, the affirmative defense of *in pari delicto* bars his claims. The trial court did not address this issue. However, Trustee's claim involves a question of law in which our scope of review is plenary and our standard of review is *de novo.* In the interest of judicial economy, we will address his claim.

K & L Gates directs our attention to the Amended Complaint's allegation that "Le–Nature's top executive orchestrated a massive and intentional fraud." Brief for Appellees (K & L Gates & Ferguson) at 58–59. K & L Gates responds, stating that "[t]he law imputes those executives' acts to Le–Nature's and the doctrine of *in pari delicto* bars the Trustee's claims on behalf of the company for K & L's alleged failure to uncover the Company's fraud." *Id.* at 59; *see also* Brief for P & W at 36–38 (similarly asserting *in pari delicto* ).

The doctrine of *in pari delicto* provides that a "plaintiff who has participated in wrongdoing may not recover damages from the wrongdoing." BLACK'S LAW DICTIONARY (7th ed.1999). *In pari delicto,* literally means "in equal fault," and is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct. *Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). "[I]n the *in pari delicto* arena, where corporate plaintiffs are involved, the subject of imputation is a key focus." *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PriceWaterhouseCoopers, LLP,* 605 Pa. 269, 989 A.2d 313, 330 n. 12 (2010) (*Allegheny II* ).

In *Allegheny II,* the defendant auditor grossly misstated the principal corporation's finances, despite knowing that certain of the corporation's agents, including its financial officer, had misstated those finances thereby hiding substantial operating losses. *Id.* at 315. The auditor gave a false impression to the board of directors that the company was in good financial condition. *Id.* The board had no knowledge of the operating losses and the company went bankrupt. *Id.*

During extensive federal litigation, the Third Circuit Court of Appeals found it necessary to petition for certification of the following question for resolution by the Pennsylvania Supreme Court: "What is the proper test under Pennsylvania law for determining whether an agent's fraud should be imputed to the principal when it is an allegedly non-innocent third-party that seeks to invoke the law of imputation in order to shield itself from liability?" *Official Comm. of Unsecured Creditors of Allegheny Health Educ. & Research Found. v. PricewaterhouseCoopers, LLP,* 607 F.3d 346, 351 (3d Cir.2010) (*Allegheny*

*I* ). Our Supreme Court answered the question as follows:

> The proper test to determine the availability of defensive imputation in scenarios involving non-innocents depends on whether or not the defendant dealt with the principal in good faith. While one of the primary justifications for imputation lies in the protection of innocents, in Pennsylvania ... it may extend to scenarios involving auditor negligence, subject to an adverse-interest exception, as well as other limits arising out of the underlying justifications supporting imputation. Imputation does not apply, however, where the defendant materially has not dealt . in good faith with the principal.

*Allegheny II,* 989 A.2d at 339. As the Supreme Court noted, imputation "recognizes that principals generally are responsible for the acts of agents committed within the scope of their authority." *Id.* at 333.

> This is, in part, because it is the principal who has selected and delegated responsibility to those agents; accordingly, the doctrine creates incentives for the principal to do so carefully and responsibly. Imputation also serves to protect those who transact business with a corporation through its agents believing the agent's conduct is with the authority of his principal.
>
> The first exception ... is that involving adverse interest—where an agent acts in his own interest, and to the corporation's detriment, imputation generally will not apply. The primary controversy surrounding the appropriate application of the adverse-interest exception here concerns the degree of self-interest required, or, conversely, the quantum of benefit to the corporation necessary to avoid the exception's application (where self-interest is evident).

*Id.* at 333–34 (citations and footnotes omitted). "[I]mputation is not justified in scenarios involving secretive, collusive activity on the part of an auditor to misstate (and/or sanction management's misstatement of) corporate financial information." *Id.* at 337.

Our Supreme Court "dr[e]w a sharp distinction between those who deal in good faith with the principal-corporation in material matters and those who do not." *Id.* at 335. Regarding those who deal in good faith with the principal corporation, the Supreme Court generally would impute an agent's bad acts to the principal corporation *if they benefit the corporation,* although the Supreme Court did not specify the extent of benefit necessary. *Id.* at 333. The Supreme Court maintained the "traditional, liberal test for corporate benefit." *Id.* at 336. For those who do not deal in good faith with the principal corporation, a third party would not be able to impute an agent's bad acts to the principal corporation if those bad acts were only in the agent's self-interest and conferred benefits only to the agent, not the corporation. *Id.* at 333–34.

Applying the Supreme Court's statement of the law in *Allegheny II,* we conclude that the averments of Trustee's Amended Complaint negate the defense of imputation. Certainly, Le–Nature's allegations aver that Defendants did not act in good faith in conducting the investigation. *See, e.g.,* Amended Complaint ¶¶ 13–15, 34–35, 50–52; 53–73, 116. Further, we cannot conclude that a material misstatement of corporate financial information, so as to hide Podlucky's looting of the company, provided any benefit to Le–Nature's. Thus, the dismissal of Trustee's Amended Complaint is not appropriate under these circumstances.

For the reasons set forth above, we conclude that trial court erred in sustain-

ing the preliminary objections of Defendants as to all causes of action asserted in the Amended Complaint. On this basis, we reverse the Order of the trial court and remand for further proceedings.

Application for Post–Submission Communication granted; Order reversed; case remanded for further proceedings; Superior Court jurisdiction relinquished.