J-A23005-25

2025 PA Super 289

| | | |
|---|---|---|
| MYERS WATER TRANSFER, LLC D/B/A HYDROEDGE SOLUTIONS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| LOLA ENERGY PETROCO, LLC | : | |
| Appellant | : | No. 1080 WDA 2024 |
| | : | |
| POCAHONTAS GAS, LLC | : | |
| | : | |
| v. | : | |
| | : | |
| LOLA ENERGY PETROCO, LLC D/B/A LOLA ENERGY AND MYERS WATER TRANSFER, LLC D/B/A HYDROEDGE SOLUTIONS | : | |

Appeal from the Judgment Entered September 11, 2024
In the Court of Common Pleas of Washington County
Civil Division at No(s): Docket No. 2021-5513

MYERS WATER TRANSFER, LLC D/B/A HYDROEDGE SOLUTIONS

    v.

LOLA ENERGY PETROCO, LLC

_____

POCAHONTAS GAS, LLC

        Appellant

    v.

LOLA ENERGY PETROCO, LLC D/B/A LOLA ENERGY AND MYERS WATER TRANSFER, LLC D/B/A HYDROEDGE SOLUTIONS

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 1145 WDA 2024

Appeal from the Order Entered September 11, 2024
In the Court of Common Pleas of Washington County
Civil Division at No(s): No. 2021-5513

BEFORE: PANELLA, P.J.E., McLAUGHLIN, J., and BENDER, P.J.E.

OPINION BY PANELLA, P.J.E.:         **FILED: DECEMBER 31, 2025**

This consolidated cross-appeal concerns a contractual dispute over the sale of used freshwater pipe. Appellant/Cross-Appellee/Defendant LOLA Energy PetroCo, LLC ("LOLA") appeals from the entry of judgment on the Court of Common Pleas of Washington County's non-jury trial verdict in favor of Appellee/Plaintiff/Intervenor Defendant Meyers Water Transfer, LLC d/b/a HydroEdge Solutions ("HydroEdge") and Appellee/Cross-Appellant/Intervenor

Plaintiff Pocahontas Gas, LLC ("Pocahontas"). On appeal, LOLA asserts that the trial court erred in finding the formation of a contract, improperly reforming the contract, ordering specific performance outside the terms of the contract, and finding that Pocahontas was an intended third-party beneficiary. Additionally, Pocahontas cross-appeals from the trial court's ruling that LOLA did not intentionally interfere with the contractual relationship between HydroEdge and Pocahontas. After careful review, we vacate the portion of the trial court's order directing LOLA to transport the remaining pipe to HydroEdge and bear the costs and remand for the trial court to determine any cost already borne by LOLA in transporting the pipe to HydroEdge. We affirm in all other respects.

We briefly summarize the underlying facts as detailed by the trial court in its memorandum in support of its verdict. *See* Trial Court Verdict, 5/24/24, at 1-12.

The relevant events took place in the Spring and Summer of 2021. LOLA owned a sixteen-inch temporary water pipeline stretching approximately 19 miles through oil and gas fields in Butler County. LOLA sought to remove the pipe to avoid ongoing liability payments to landowners who permitted the pipe to cross their land. LOLA solicited bids for the removal of the pipe. In March of 2021 HydroEdge offered to remove the pipe. In April of 2021 HydroEdge informed LOLA that it had an interested buyer for a portion of the pipe and later informed LOLA that the buyer was interested in purchasing the entire

pipeline. Ultimately, LOLA gave the removal contract to another bidder, B & B and LOLA continued to explore options for selling the pipe. Once the removal of the pipeline began, LOLA realized that it did not have enough space to store the pipe and had an immediate need to rid itself of the pipe once it was removed.

In mid-May of 2021, CNX determined that it needed 16-inch pipe for its Virginia operations conducted by Pocahontas and contacted HydroEdge to see if it could provide 25,000 feet of such pipe. HydroEdge informed CNX that it could and returned to discussions with LOLA. The trial court detailed the negotiations and initial performance of the contract.

> On June 2, 2021, HydroEdge informed LOLA that CNX was interested in purchasing the pipe. HydroEdge requested permission for CNX to inspect LOLA's pipe. The next day, LOLA permitted representatives of CNX to inspect pipe at LOLA controlled locations. CNX was pleased with the quality of the pipe and asked if the pipe could be "cut on welds in lengths of 40 to 50 foot." CNX wanted the "whole 19 miles of pipe."

> On June 7, 2021, HydroEdge offered LOLA $3 per foot to purchase "the 19 miles of pipe that is currently being rigged down." HydroEdge indicated that it would "handle all trucking and loading of pipe." HydroEdge conditioned its offer on the pipe being cut in 40 to 50 foot sections. HydroEdge stated that it would seek a price adjustment for "variations" greater than "10%."

> Having received HydroEdge's offer that included CNX's specification, LOLA immediately directed its removal contractor, B & B, to begin cutting the removed pipe on the welds and into forty (40') to fifty (50') foot segments, that LOLA field representatives called "fillets."

> On June 9, 2021, HydroEdge emailed [] CNX an offer. Specifically, HydroEdge offered to sell 100,320 feet of 16" DR11

- 4 -

HDPE used pipe to CNX. HydroEdge quoted a price of $8.00 per foot. CNX did not immediately accept this offer.

On June 25, 2021, after some period of negotiation, CNX emailed a purchase order to HydroEdge. The purchase order indicated that [Pocahontas] was offering to purchase 100,320 feet of 16" DR 11 HDPE-used pipe for $8 a foot. This purchase order also included in fine print Poc[a]h[o]ntas' "TERMS AND CONDITIONS OF PURCHASE." Paragraph 7 of those terms and conditions stated:

> No liability shall result to either party from delay in performance or from nonperformance caused by circumstances beyond the reasonable control of such party, provided that such party is diligent in attempting to remove any such cause and promptly notifies the other party of its extent and probable duration. If, due to any such cause, Seller is unable to supply the total of all demands for items or services required by this contract, then Seller shall allocate its available supply among all purchasers then under contract, including Buyer, on a fair and equitable basis. If any such delay in performance or nonperformance by Seller continues for ten (10) days, then Buyer shall have the right to terminate this entire contract or any portion of it without penalty.

In turn, on the same day, HydroEdge again emailed LOLA its offer to purchase "roughly" 19 miles of pipe to be cut into 40 to 50 foot sections. HydroEdge sent this second email to LOLA in order to confirm the terms it had sent in its offer of June 7, 2021. At that time, HydroEdge understood that LOLA had given "small insignificant amounts" of pipe to landowners. HydroEdge requested that LOLA provide a formal acceptance to HydroEdge's outstanding offer.

LOLA's "point person" to decommission the temporary water line, Vice President Jayson Johnson, responded. Mr. Johnson acknowledged that as of that time, he knew that CNX or a CNX affiliate was going to purchase the subject pipe from HydroEdge. With this knowledge, Mr. Johnson requested that HydroEdge provide a "formal purchase agreement or bill of sale."

On June 29, 2021, Michael Ulam, Director of Financial Planning and Solutions for HydroEdge, sent a written quote to Mr. Johnson. The "Quote" detailed the quantity ("100320"), description ("16″ HDPE Purchase-Estimated Footage"[)], the unit cost ("3.00") and total cost for the pipe to be purchased. This "Quote" specified that the pipe was to be "cut on welds, in 40′ to 50′ sections.["] The "Quote" also provided that HydroEdge would load and transport the pipe.

On July 6, 2021, Mr. Johnson, on behalf of LOLA, responded with a revision to HydroEdge's Quote. LOLA did not quibble with the quantity, description, the unit and total costs nor did it alter the pipe specifications. Instead, LOLA added:

> Once HydroEdge has loaded the pipe and removed it from the LOLA work site, HydroEdge will have custody of the pipe and will be deemed to have inspected and accepted the pipe and will pay the agreed upon price above.

On the next day, Ryan Honaker, a HydroEdge representative, responded that "HydroEdge agrees to these terms." Mr. Honaker indicated that he would arrange equipment and trucking necessary to complete the purchase and asked that LOLA's Director of Land Development Robert Zwierzynski contact him to coordinate the pickup of pipe.

Trial Court Verdict, 5/24/24, at 5-8 (footnotes omitted) (some capitalization provided).

Over about a month, HydroEdge picked up 29,295.5 feet of used pipe from LOLA. During that period, Mr. Honaker and Mr. Zwierzynski were in regular contact. However, things began to change on August 13, 2021, when LOLA received an offer of $4.50 per foot of pipe of an unspecified size from Snyder Bros. president David Snyder. Snyder is a board member on the Board of Managers for LOLA Energy III, LLC. James Crockard, LOLA's CEO, is also a member of that same board.

- 6 -

Over HydroEdge's protestations, Crockard ceased all sales of pipe to HydroEdge. Three days later, on August 16, 2021, LOLA sent its first invoice to HydroEdge demanding payment of $65,311.50 for a majority of the pipe that HydroEdge accepted. HydroEdge attempted but could not find any other similar used freshwater pipe, and received quotes for new pipe ranging from $39.50 to $43.73 per foot.[1]

On August 18, 2021, HydroEdge filed the instant breach of contract action against LOLA and sought injunctive relief, specific performance, and unspecified compensatory damages. LOLA and HydroEdge jointly determined that LOLA had 19,896 feet of pipe remaining. On August 31, 2021, the trial court held a hearing on HydroEdge's request for injunctive relief. While awaiting the trial court's decision, LOLA made efforts to recover the pipe it had given away to landowners. LOLA was able to recover 7,500 feet of pipe, all from a single family. However, rather than adding this pipe to the inventory, LOLA sold it to Snyder Bros. On October 14, 2021, the trial court granted injunctive relief prohibiting LOLA from disposing of the remaining pipe.

---

[1] The testimony at trial indicated that LOLA significantly undervalued its freshwater pipe, as estimates for the value of similar used pipe at that time ranged from $15 to $28 per foot. **See** Trial Court Verdict, 5/24/24, at 9-10. The trial court based its damages calculation for Pocahontas on a market price in 2021 of $20 per foot of similar used freshwater pipe. **See id.** at 23.

Thereafter, LOLA filed an answer, new matter, and counterclaim to HydroEdge's complaint, claiming that HydroEdge never paid for the 29,265.5 feet of pipe it received and seeking $87,889.50 in compensatory damages. The trial court permitted Pocahontas to intervene, and on September 12, 2022, Pocahontas filed a complaint asserting claims against both HydroEdge and LOLA. Pocahontas claimed that HydroEdge breached their contract, that LOLA interfered with that contract, and, in the alternative, that LOLA breached its duties to Pocahontas, a third-party beneficiary to the LOLA-HydroEdge contract.

A five-day non-jury trial commenced on September 18, 2023. Thereafter, the parties submitted proposed findings of fact and conclusions of law. On May 24, 2024, the trial court entered its "Non-Jury Verdict and Decree Directing Specific Performance" ruling in favor of HydroEdge and Pocahontas.

On June 12, 2024, the trial court entered an order extending the time for LOLA to specifically perform and clarifying "that the term 'delivery' as used in the verdict means 'shipping' and was not intended to require LOLA to provide 19,146 feet of HDPE 16 inch used freshwater pipe free of any charge."[2] 1925(a) Statement, 11/12/24, at 2-3. LOLA and Pocahontas filed post-trial motions that were denied by the trial court on August 26, 2024. On September

_____

[2] The order is dated June 10, 2024 but was not filed until June 12, 2024.

11, 2024, judgment on the non-jury trial verdict was entered in favor of HydroEdge and Pocahontas and against LOLA. The final judgment ordered:

(1) LOLA owed Pocahontas and HydroEdge $590,769.20 and $142,093.60, respectively, plus post judgment interest pursuant to 42 Pa.C.S.A. § 8101;

(2) LOLA shall deliver 19,146 feet of DR 11 16" HDPE used freshwater pipe cut on welds in forty or fifty foot sections at a location as designated by HydroEdge by September 6, 2024;

(3) LOLA shall post security in the amount of $879,435.36; and

(4) the court's Decree Directing Specific Performance was stayed pending appellate review upon LOLA posting the sum of $146,147.00. **See** Order, 9/11/24, at 2-3; **see also** Trial Court Verdict, 5/24/24, at 1-2.

LOLA and Pocahontas both timely appealed. Upon request of the parties, we consolidated the appeals. The trial court wrote a Pa.R.A.P. 1925(a) Statement in Lieu of Opinion that briefly summarized its May 24, 2024 Memorandum and the post-trial procedural history.

LOLA raises the following issues on appeal.

1. Did the trial court commit an error of law by finding in favor of HydroEdge and against LOLA, when the evidence demonstrates that: (1) the parties did not assent to the essential terms of the alleged contract because the contract did not have a definite quantity, was subject to language of limitation, and neither party knew the quantity of Pipe available; and (2) the alleged contract did not comply with the Pennsylvania Statute of Frauds?

2. Assuming the trial court correctly found an enforceable contract existed between HydroEdge and LOLA, did the trial court commit

- 9 -

an error of law by finding LOLA liable to HydroEdge for 41,576.5 feet of Pipe to fulfill the agreement, where the parties had a mutual mistake of fact regarding the quantity of pipe available for sale at the time of contract formation, and where the trial court incorrectly applied the express language of the contract, thereby improperly reforming the contract?

3. In the event the trial court correctly found an enforceable contract existed between HydroEdge and LOLA, did the trial court commit an error of law in its decree directing specific performance when it required LOLA to handle all trucking and delivery of the Pipe locally to HydroEdge, when the contractual terms between the parties expressly provided that HydroEdge would handle all trucking and loading of the Pipe?

4. Did the trial court commit an error of law by finding in favor of Pocahontas as an intended third-party beneficiary to the alleged contract between LOLA and HydroEdge, when the evidence demonstrates LOLA did not know that Pocahontas was a third-party purchaser and lacked any knowledge regarding Pocahontas' purchase of pipe from HydroEdge, and that the specifications the trial court identified as a circumstance to effectuate the parties intent was a common industry standard and not a custom requirement?

Appellant's Brief, at 6-7 (some issues renumbered for ease of disposition).

Additionally, as cross-appellant, Pocahontas raises the following issues.

1. Whether the trial court erred by applying the incorrect test or standard in finding that LOLA did not intentionally interfere with the contractual relationship between Pocahontas and HydroEdge?

2. Whether the trial court erred by making inconsistent findings regarding LOLA's notice or knowledge of the contractual relationship between Pocahontas and HydroEdge?

3. Whether the trial court erred by holding that LOLA did not intentionally interfere with the contractual relationship between Pocahontas and HydroEdge?

Cross-Appellant's Brief, at 2.

- 10 -

Our standard and scope of review of a non-jury trial verdict are well established.

> Our standard of review in non-jury trials is to assess whether the findings of facts by the trial court are supported by the record and whether the trial court erred in applying the law. Upon appellate review, the appellate court must consider the evidence in the light most favorable to the verdict winner and reverse the trial court only where the findings are not supported by the evidence of record or are based on an error of law. Our scope of review regarding questions of law is plenary.

**Woullard v. Sanner Concrete & Supply**, 241 A.3d 1200, 1207 (Pa. Super. 2020) (brackets and citation omitted).

"The interpretation of a contract is a matter of law and, as such, we need not defer to the trial court's reading of the agreement." **Lenau v. Co-eXprise, Inc.**, 102 A.3d 423, 429 (Pa. Super. 2014) (citation and brackets omitted). "[I]n interpreting an agreement, the court must ascertain the intent of the parties" as expressed in the writing. **Id.** (citations omitted). Further,

> We will find the parties' agreement enforceable as a contract when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity. An agreement is expressed with sufficient clarity if the parties intended to make a contract and there is a reasonably certain basis upon which a court can provide an appropriate remedy. Accordingly, not every term of a contract must always be stated in complete detail. If the parties have agreed on the essential terms, the contract is enforce[a]ble even though recorded only in an informal memorandum that requires future approval or negotiation of incidental terms. In the event that an essential term is not clearly expressed in their writing but the parties' intent concerning that term is otherwise apparent, the court may infer the parties' intent from other evidence and impose a term consistent with it. Indeed, terms of an agreement that appear otherwise vague may be rendered definite by subsequent

- 11 -

performance: One or both parties may perform in such a way as to make definite that which was previously unclear.

***Helpin v. Trustees of Univ. of Pennsylvania***, 969 A.2d 601, 610-11 (Pa. Super. 2009) (internal citations, quotation marks, and brackets omitted).

The transaction in this case involved the sale of goods and thus is governed by the Pennsylvania Uniform Commercial Code ("UCC"). Under the UCC, "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." 13 Pa.C.S.A. § 2204(a). The UCC "must be liberally construed and applied to promote its underlying purposes and policies," which include "simplify[ing], clarify[ing] and moderniz[ing] the law governing commercial transactions" and "permit[ing] the continued expansion of commercial practices through custom, usage, and agreement of the parties[.]" 13 Pa.C.S.A. § 1103(a)(1)-(2). Additionally, "[u]nless displaced by the particular provisions of [the UCC], the principles of law and equity . . . supplement its provisions." 13 Pa.C.S.A. § 1103(b).

In its first issue, LOLA claims that the trial court erred in finding an enforceable contract because the parties did not assent to its essential terms and never signed a contract in violation of the Statute of Frauds. We address LOLA's mutual assent argument first.

LOLA argues that there was no mutual assent to the quantity of pipe to be sold, as quantity is a "definitive and invariable requirement," because the "Quote" mentions "Estimated Footage", HydroEdge knew that LOLA was giving

some amount of pipe away to landowners, and HydroEdge's purported acceptance contained a unilateral change that allowed HydroEdge to set aside any pipe it determined was "questionable" which created further uncertainty regarding the total amount of the pipe. *See* Appellant's Brief, at 22-23. Conversely, HydroEdge argues that the trial court correctly concluded that the written communications between LOLA and HydroEdge demonstrated both parties' mutual assent to the essential terms of the contract. *See* Appellee's Brief, at 20-25. Further, HydroEdge argues that its "clarification language" to set aside any pipe that was "questionable" was consistent with the "**estimated**" quantity of 100,320 feet and LOLA never objected to this language. *Id.* at 25 (emphasis in original).

The trial court accurately summarized the communications and actions between LOLA and HydroEdge that resulted in the formation of a binding contract.

> In this case, the written communications between LOLA and HydroEdge along with their acts and conduct establish the existence of an enforceable contract to purchase approximately 100,320 feet of pipe. At HydroEdge's request, LOLA permitted persons affiliated with CNX to inspect the used pipe on June 2, 2021. On June 7, 2021, by email, HydroEdge offered LOLA $3 per foot to purchase 19 miles of pipe, with the condition that such pipe was cut on welds into forty or fifty foot sections. LOLA then directed its removal contractor to cut pipe on welds in forty or fifty foot lengths. On June 25, 2021, HydroEdge advised that it had a confirmed buyer and reiterated its earlier offer. LOLA responded by requesting a bill of sale or formal purchase agreement. HydroEdge promptly sent a written "Quote."
>
> On July 6, 2021, LOLA, through its Vice President, Jayson Johnson, emailed HydroEdge with a slight change to the "Quote."

- 13 -

Mr. Johnson did not indicate that LOLA lacked 19 miles of pipe or that the sale would be a "load by load" transaction for as long as LOLA desired. Instead, Mr. Johnson specified that once HydroEdge loaded and removed pipe it was obligated to pay for the pipe. On July 7, 2021, Ryan Honaker replied by email that HydroEdge accepted the changes Johnson requested.

Over the next month, LOLA provided HydroEdge with 29,295.5 feet of the used pipe cut in forty to fifty foot "fillets." On August 16, 2021, by invoice LOLA billed HydroEdge $3 per foot for the pipe it provided. Thus, clear evidence demonstrates LOLA and HydroEdge's mutual assent to the terms of the Quote that LOLA revised and HydroEdge immediately accepted.

Trial Court Verdict, 5/24/24, at 12-13 (footnotes omitted) (some capitalization provided).

As described by the trial court, LOLA and HydroEdge clearly agreed to the essential terms of the agreement. The estimated footage was clearly assented to by LOLA and HydroEdge. HydroEdge indicated in its communications and Quote that it was purchasing "roughly" 19 miles of pipe or an "estimated footage" of 100,320, and that "slight variation" from the estimate might occur from pipe being left to landowners, and any variation greater than 10% would require a price adjustment. LOLA never objected to the estimated quantity of pipe, LOLA sent a counteroffer to HydroEdge which HydroEdge promptly accepted, and then LOLA began performing the contract. In other words, LOLA and HydroEdge mutually assented to an estimated quantity of 100,320 feet of pipe with a variation of 10%. LOLA has not presented any compelling argument or supporting case law to support why

- 14 -

such agreed to estimates and variations support its contention that it did not assent to the quantity term; therefore, this argument fails.

Next, LOLA claims that a contract was not formed because the parties merely exchanged emails and neither party affixed a signature to their agreement in violation of the UCC Statute of Frauds. ***See*** Appellant's Brief, at 24-26. HydroEdge argues that the emails between LOLA and HydroEdge constituted "signed" writings under the UCC Statute of Frauds. ***See*** Appellee's Brief, at 30-31.

The UCC's Statute of Frauds provision states

**(a) General rule.--**Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is a record sufficient to indicate that a contract for sale has been made between the parties and **signed by the party against whom enforcement is sought** or by the party's authorized agent or broker. A record is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this subsection beyond the quantity of goods shown in the record.

13 Pa.C.S.A. § 2201(a) (emphasis added).

It has long been recognized that a signature can take many forms.

Any signature or mark, when coupled with an intent by the maker that it be a signature, will satisfy the statute of frauds is so well settled that citations to the legions of cases so holding are unnecessary. The essential question has little to do with the particular symbol used on the contract or deed. Rather, the question is, did the party execute . . . the symbol with a present intention, actual or apparent, to authenticate the writing as the signer of the writing?

- 15 -

*Calisto v. Rodgers*, 271 A.3d 877, 882 (Pa. Super. 2022) (*en banc*) (citations, quotation marks, and emphasis omitted). As such, an unsigned document that includes the seller's name has been recognized as satisfying the signature requirement. *See Hessenthaler v. Farzin*, 564 A.2d 990, 993-94 (Pa. Super. 1989) (holding that a mailgram which merely stated the sellers' names satisfied the signature requirement).

Under the UCC, the Comment to Section 2201 states in part that a contract "must be 'signed', a word which includes **any** authentication which identifies the party to be charged[.]" 13 Pa.C.S.A. § 2201, Comment 1 (emphasis added). Under the UCC, "signed" means "with present intent to authenticate or adopt a record: (i) execute or adopt a tangible symbol; or (ii) attach to or logically associate with the record an electronic symbol, sound or process."[3] 13 Pa.C.S.A. § 1201(b)(37) (definitions).

We note that we are unaware of any Pennsylvania cases that have specifically held that an unsigned email satisfies the UCC's Statue of Frauds signature requirement. Nevertheless, we have little trouble in concluding that the present emails, utilizing clear terms indicating a contractual relationship, satisfied the Statute of Frauds. Other jurisdictions applying the UCC have recognized that a name on an email satisfies the Statute of Frauds. *See Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289, 296 (7th Cir. 2002) ("we conclude

---

[3] A "record" is defined as "[i]nformation that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." 13 Pa.C.S.A. § 1201(b)(31) (definitions).

without having to rely on the federal Act that the sender's name on an e-mail satisfies the signature requirement of the statute of frauds.").[4]

Here, LOLA's representatives sent the emails from their work email address and identified themselves by their names and positions within the company. This demonstrated an intent to authenticate the content of the email; this is all the UCC requires to satisfy the Statute of Frauds. Therefore, LOLA's first issue is without merit.[5]

In its second issue, LOLA again attacks the definiteness of the quantity term of the contract, this time under the doctrine of mutual mistake of fact. LOLA argues that there was a mutual mistake of fact because both LOLA and HydroEdge had a mistaken belief as to the amount of pipe LOLA had available for sale at the time of the agreement. ***See*** Appellant's Brief, at 32.

---

[4]

> Our Supreme Court has noted that while it is a truism that decisions of sister states are not binding precedent on this Court, they may be persuasive authority, and are entitled to even greater deference where consistency and uniformity of application are essential elements of a comprehensive statutory scheme like that contemplated by the UCC.

***Commercial Nat. Bank, of Pa. v. Seubert & Assocs., Inc.***, 807 A.2d 297, 303 (Pa. Super. 2002) (citation, quotation marks, and brackets omitted); ***see*** 13 Pa.C.S.A. § 1103(c) (underlying purpose of UCC includes making law among various jurisdictions uniform).

[5] HydroEdge also argues that LOLA and HydroEdge were "merchants" under 13 Pa.C.S.A. § 2201(b), and thus a signature was not necessary. ***See*** Appellee's Brief, at 31-36. Given our disposition of this issue, and because the trial court did not address whether LOLA and HydroEdge were "merchants" under the UCC, we decline to address this argument.

"A mutual mistake occurs when the written instrument fails to set forth the true agreement of the parties." ***Allen-Myland, Inc. v. Garmin Int'l, Inc.***, 140 A.3d 677, 693 (Pa. Super. 2016) (citation omitted). "[T]o obtain reformation of a contract because of mutual mistake, the moving party is required to show the existence of a mutual mistake by evidence that is clear, precise and convincing." ***Felix v. Giuseppe Kitchens & Baths, Inc.***, 848 A.2d 943, 948 (Pa. Super. 2004) (citation omitted). One condition to void a contract based on mutual mistake of fact is that "the mistake must not be one as to which the party seeking relief bears the risk." ***Step Plan Servs., Inc. v. Koresko***, 12 A.3d 401, 410 (Pa. Super. 2010) (citation omitted).

A party bears the risk of a mistake when

> (a) the risk is allocated to him by agreement of the parties, or
>
> (b) **he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient**, or
>
> (c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

***Id.*** at 411 (citation omitted) (emphasis added).

Here, LOLA, as the owner and seller of the pipe, bore the risk of the amount of pipe it had. HydroEdge was aware that LOLA had given away some pipe to landowners but had no knowledge of how much pipe LOLA had given away. As HydroEdge stated, the contract "included such language to account

for the 'slight variation' to the contracted for quantity of 100,320 feet of pipe that could result due to pipe given away, unusable or damaged pieces." Appellee's Brief, at 43. Only LOLA was in the position to know exactly how much pipe it had given away to landowners.[6] LOLA treated its limited knowledge about the amount of pipe it had as sufficient to enter into an agreement with HydroEdge. Thus, it cannot now claim that there was a mutual mistake as to how much pipe it had in its possession. *See Allen-Myland, Inc.*, 140 A.3d at 694 ("A mistake cannot be mutual where party A relies on party B's expertise and party B makes a mistake in the exercise of its expertise.").

Additionally, LOLA argues that the trial court improperly interpreted the 10% variation language in the contract because the language did not state that 10% of the subject pipe would not be available but rather that, if more than 10% were not available, HydroEdge would require a price adjustment. *See* Appellant's Brief, at 34-37. According to LOLA, "[i]n other words, the language of the contract can only be construed as a trigger for renegotiation, *not* a reflection of the parties' estimation of the quantity of [p]ipe available." Appellant's Brief, at 35-36 (emphasis in original). HydroEdge argues that, when the agreement is read as a whole, the trial court correctly concluded

---

[6] The trial court rejected LOLA's assertion that it gave away 42,000 feet of pipe to landowners because "LOLA kept no records of those giveaways." Trial Court Verdict, 5/24/24, at 20. Additionally, the trial court found that "the credible trial evidence only establishe[d] that 7500 feet of pipe was given to the Blauser [f]amily." *Id.* at 20-21.

- 19 -

that the 10% variation language indicated that HydroEdge and LOLA contemplated that LOLA might not be able to provide as much as 10% of the agreed to amount. **See** Appellee's Brief, at 41-44. Thus, in such a situation, LOLA would be liable for the agreed to amount of pipe, minus 10%. **See id.** We agree with HydroEdge.

"[T]he entire contract should be read as a whole . . . to give effect to its true purpose." **Com. ex rel. Kane v. UPMC**, 129 A.3d 441, 463-64 (Pa. 2015) (citation omitted). When read as a whole, the 10% variation language was included to account for the amount of pipe that LOLA left to landowners. The "true agreement of the parties" was that LOLA would transfer at least an amount less than 10% of the estimated footage of pipe to HydroEdge. This is precisely what the agreement stated, and LOLA cannot now rely on those terms of the contract to avoid liability for failing to fulfil its contractual obligations. Therefore, LOLA's second contention is without merit.

In its third issue, LOLA argues that the trial court erred in ordering that LOLA was required to transport the remaining 19,146 feet of pipe to HydroEdge when the record demonstrates that HydroEdge contracted to "handle all trucking and loading of pipe." **See** Appellant's Brief, at 48-50. LOLA argues that the parties were bound by the express terms of the contract that HydroEdge would handle transportation of the pipe and by shifting that obligation to LOLA the trial court improperly rewrote the contract. **See id.** at 49-50. HydroEdge argues that the UCC grants courts broad discretion to craft the scope of specific performance. **See** Appellee's Brief, at 45.

"Specific performance is a court order directing a party to fulfill a contractual obligation." *Matthew 2535 Props., LLC v. Denithorne*, 313 A.3d 223, 227 n.1 (Pa. Super. 2024) (*en banc*) (citation omitted). It is an equitable remedy and "should only be granted where the facts clearly establish the plaintiff's right thereto; where no adequate remedy at law exists; and, where the court believes that justice requires it." *Michael & Linda, LLC v. Smith*, 216 A.3d 262, 267 (Pa. Super. 2019) (citation and brackets omitted). Under the UCC, "[s]pecific performance may be decreed where the goods are unique or in other proper circumstances." 13 Pa.C.S.A. § 2716(a). "The decree for specific performance may include such terms and conditions as to payment of the price, damages, or other relief as the court may deem just." 13 Pa.C.S.A. § 2716(b). Further, the comment to Section 2716 states

> In view of this Article's emphasis on the commercial feasibility of replacement, a new concept of what are 'unique' goods is introduced under this section. Specific performance is no longer limited to goods which are already specific or ascertained at the time of contracting. The test of uniqueness under this section must be made in terms of the total situation which characterizes the contract. Output and requirements contracts involving a particular or peculiarly available source or market present today the typical commercial specific performance situation, as contrasted with contracts for the sale of heirlooms or priceless works of art which were usually involved in the older cases. However, uniqueness is not the sole basis of the remedy under this section for the relief may also be granted "in other proper circumstances" and inability to cover is strong evidence of "other proper circumstances."

13 Pa.C.S.A. § 2716, Comment 2.

We are constrained to agree with LOLA that the trial court erred as a matter of law in directing it to specifically perform contrary to the express

- 21 -

terms of the agreement. Specific performance may only direct "a party to fulfill a contractual obligation." **Denithorne**, 313 A.3d at 227. In other words, a party cannot be ordered to specifically perform something outside of the terms of the contract. We do not interpret the phrase "in other proper circumstances" in the UCC's specific performance provision to be so broad as to allow courts to issue a decree directing a party to specifically perform contrary to the agreed terms of the contract. Rather, the UCC comment describes "a new concept of what are 'unique' goods" in the context of the sale of goods. 13 Pa.C.S.A. § 2716, Comment 2.

Here, it is undisputed that the terms of the contract stated that "HydroEdge [is] to handle all trucking and loading of the pipe." HydroEdge Quote, 6/28/21. Despite this the trial court ordered that LOLA transport the remaining 19,146 feet of pipe to HydroEdge free of shipping and transportation costs. **See** Trial Court Verdict, 5/24/24, at 2; Order, 9/11/24, at 2. The record clearly shows that this was error, requiring us to vacate this portion of the order.

Therefore, based on the foregoing, we must vacate the portion of the trial court's order directing LOLA to transport the remaining pipe to HydroEdge contrary to the language of the contract, and remand for the trial court to hold whatever proceeding it deems necessary to determine any cost incurred by LOLA in transporting the remaining pipe to HydroEdge.

In its fourth and final issue, LOLA claims that the trial court erred in finding that Pocahontas was an intended third-party beneficiary of the contract

between LOLA and HydroEdge. LOLA argues that the trial court committed an error of law because LOLA never knew that Pocahontas was a third-party purchaser and cutting the pipe in 40 to 50 foot sections is common industry standard and not specific to Pocahontas. **See** Appellant's Brief, at 37. Pocahontas argues that LOLA did not need to know its identity as a third-party beneficiary, and the trial court's factual findings supported its conclusion that Pocahontas was an intended third-party beneficiary. **See** Cross-Appellant's Brief, at 51-53.

A contract need not state that a third party is intended to be a beneficiary. **See Kirschner v. K & L Gates LLP**, 46 A.3d 737, 762 (Pa. Super. 2012). In that scenario, our courts have stated a two-part test for determining whether one is a third-party beneficiary to a contract.

> (1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

**Id.** (citation omitted). Accordingly, "in order for one to achieve third party beneficiary status, that party must show that both parties to the contract so intended, and that such intent was within the parties' contemplation at the time the contract was formed." **Id.** (citation omitted).

The trial court explained its factual findings and reasoning in support of its conclusion that Pocahontas was an intended third-party beneficiary of the contract.

Here, the intentions of HydroEdge and LOLA were to get rid of the subject pipe by selling it to a willing third party and to make some money doing that. LOLA well knew and understood that HydroEdge was not the ultimate purchaser of the subject pipe. In late April of 2021, to "add color" to their bid to remove the pipeline, HydroEdge informed LOLA that it was "confident" in its ability to find a buyer for the whole 19 miles of pipe. Though LOLA did not award the removal contract to HydroEdge, within a short period of time HydroEdge and LOLA began negotiations for the sale of the removed pipe to HydroEdge. At this time, HydroEdge informed LOLA that a third party, CNX, was interested in purchasing the pipe.

Further, **the circumstances indicate that LOLA intended to give the third party CNX purchaser the benefit of the promised performance**. LOLA permitted CNX representatives to inspect some of the pipe located at LOLA controlled locations. After the inspection, HydroEdge informed LOLA that the CNX purchaser wanted the pipe cut on welds and into either 40 or 50 foot sections.

LOLA then instructed its removal contract[or] to cut the pipe on welds and into [] 40 or 50 foot sections. These efforts occurred prior to HydroEdge sending its "Quote" that LOLA revised and HydroEdge accepted. Thus, at its inception, the LOLA-HydroEdge deal was one aimed at selling pipe to a CNX purchaser.

. . .

Here, LOLA knew it was dealing with a CNX purchaser of the pipe who wanted the pipe cut on welds in 40 and 50 foot sections. LOLA cut the pipe accordingly. In other words, when it struck its deal with HydroEdge, LOLA contemplated that a CNX purchaser, like Poc[a]h[o]ntas would be the ultimate purchaser of the pipe and a third-party beneficiary to the contract.

Trial Court Verdict, 5/24/24, at 17-19 (footnotes omitted) (emphasis added) (some capitalization provided).

We agree with the trial court. We further note that the trial court found

that LOLA's price of $3 per foot, and even HydroEdge's price of $8 per foot,

were significantly below market value. *See* Trial Court Verdict, 5/24/24, at 9-10, 23. In other words, LOLA allowed CNX to inspect the pipe, complied with CNX's wishes as communicated by HydroEdge to cut the pipe in 40 to 50 foot sections, and offered a price to HydroEdge well below market value that allowed HydroEdge to in turn sell the pipe to Pocahontas also below market value. LOLA contemplated the subsequent sale to a third-party purchaser, CNX or its affiliates, and acted accordingly. Therefore, the trial court did not err in concluding that Pocahontas was an intended third-party beneficiary to the contract.

Next, we address the issues raised by Pocahontas in its cross-appeal. The three issues raised by Pocahontas are interrelated and challenge the trial court's determination that LOLA did not intentionally interfere with Pocahontas and HydroEdge's contract. Generally, Pocahontas argues that because LOLA was aware of the presence of a CNX affiliate as a third-party purchaser, LOLA was aware that by breaking its contract with HydroEdge it would affect Pocahontas, which is sufficient to establish tortious interference with a contractual relationship. *See* Cross-Appellant's Brief, at 59-66.

For a claim of tortious interference with a contractual relationship, a party must show:

> (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Rice Drilling B, LLC v. Scott*, 325 A.3d 663, 677 (Pa. Super. 2024) (citation and brackets omitted). "The second element requires proof that the defendant acted for the specific purpose of causing harm to the plaintiff." *Empire Trucking Co. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 933 (Pa. Super. 2013) (citation and internal quotation marks omitted).

Again, we rely on the well-reasoned opinion of the trial court.

In this case, there is no evidence that LOLA intended to harm [Pocahontas]. Instead, the trial evidence credibly and persuasively revealed that LOLA faced an awful predicament in August of 2021. A key member of its board learned of the sale of the removed pipe. LOLA soon realized that it committed a series of errors and missteps with an asset that it had grossly undervalued. LOLA breached its deal not because it sought to put [Pocahontas] out of business. Indeed, the evidence reveals LOLA only learned of [Pocahontas'] identity at the hearing regarding [HydroEdge's] request for a preliminary injunction. Clearly, LOLA broke its promise to assuage an influential and "testy" board member.

Trial Court Verdict, 5/24/24, at 24; *see also* 1925(a) Statement, 11/12/24, at 3 ("[R]ecognizing that LOLA's conduct was motivated by an intention to quickly assuage the concerns of a board member, [the trial] court did not find that LOLA intended to harm Poc[a]hontas.").

As stated by the trial court, LOLA did not intend to harm Pocahontas but rather acted to collect greater profits and appease a board member. This did not amount to tortious interference with HydroEdge and Pocahontas' contractual relationship. Therefore, the issues raised by Pocahontas in its cross-appeal do not merit relief.

Accordingly, for the reasons stated in this Opinion, we vacate the portion of the trial court's order directing LOLA to transport the remaining pipe to HydroEdge and bear the transportation costs and remand for the trial court to determine the cost borne by LOLA in transporting the pipe to HydroEdge. We affirm in all other respects.

Judgment affirmed in part and vacated in part. Case remanded. Jurisdiction relinquished.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/31/2025